AMENDED AND RESTATED LEASE AGREEMENT BETWEEN

MONTGOMERY CORPORATE CENTER, INC.,

AS LANDLORD, AND

ASCENSUS, INC.,

AS TENANT

DATED JANUARY 31st, 2013

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

EXHIBIT "B"

## BASIC LEASE INFORMATION

Lease Date:                                The date the Lease is fully executed by Landlord and delivered by Landlord to Tenant

Landlord:                                **MONTGOMERY CORPORATE CENTER, INC.,** a California corporation

Tenant:                                    **ASCENSUS, INC.,** a Delaware corporation

Premises:                                168,921 rentable square feet, in the office building commonly known as THE MONTGOMERY CORPORATE CENTER whose street address is 200 Dryden Road, Dresher, PA 19025 together with the non-exclusive right to use all corridors, lobbies, elevators, parking areas, driveways, delivery areas and related areas (collectively the "**Building**").  The Premises are outlined on the plan attached to the Lease as <u>Exhibit A-1</u>.  The land on which the Project is located (the "**Land**") is described on <u>Exhibit B</u>.  Landlord is the ground lessee of the parcel of Land.

Term:                                  A period of time commencing on the Commencement Date and continuing through and expiring at 5:00 p.m. local time on June 30, 2027, subject to adjustment and earlier termination as provided in the Lease.

Commencement Date:                    January 1, 2013.

-i-

703779067.9 30-Jan-13 10:47

Basic Rent:                    Basic Rent shall be the following amounts for the following periods of time:

| **Lease Year** | **Period** | **SF** | **Annual Primary Rent Rate Per Rentable Square Foot in the Premises** | **Base Year Portion of Operating Costs and Taxes per Rentable Square Foot in Premises** (the below listed costs do not include electricity [which is to be paid on a "net" basis], Excess Operating Costs and/or any other additional rent payments due under the Lease) | **Months** | **Monthly Primary Rent Plus Estimated Base Year Operating Costs and Taxes** (the below listed amounts do not include electricity which is to be paid on a "net" basis] and Excess Operating Costs and/or any other additional rent payments due under the Lease) | **Annualized Primary Rent Plus Base Year Operating Costs and Taxes** (the below listed amounts do not include electricity which is to be paid on a "net" basis] and Excess Operating Costs and/or any other additional rent payments due under the Lease) |
|---|---|---|---|---|---|---|---|
| 1 | January 1, 2013 - June 30, 2013 | 168,921 | $16.00 | $7.75 | 6 | $334,322.81 | $4,011,873.75 |
| 2 | July 1, 2013 - June 30, 2014 | 168,921 | $16.48 | $7.75 | 12 | $341,079.65 | $4,092,955.83 |
| 3 | July 1, 2014 - June 30, 2015 | 168,921 | $16.97 | $7.75 | 12 | $347,977.26 | $4,175,727.12 |
| 4 | July 1, 2015 - July 31, 2015 | 168,921 | $17.48 | $7.75 | 1 | $355,156.40 | $4,261,876.83 |
| 4 | August 1, 2015 - June 30, 2016 | 160,921 | $17.48 | $7.75 | 11 | $338,336.40 | $4,060,036.83 |
| 5 | July 1, 2016 - June 30, 2017 | 160,921 | $18.01 | $7.75 | 12 | $345,443.75 | $4,145,324.96 |
| 6 | July 1, 2017 - June 30, 2018 | 132,921 | $14.50 | $9.00 | 12 | $260,303.63 | $3,123,643.50 |
| 7 | July 1, 2018 - June 30, 2019 | 132,921 | $15.00 | $9.00 | 12 | $265,842.00 | $3,190,104.00 |
| 8 | July 1, 2019 - June 30, 2020 | 132,921 | $15.50 | $9.00 | 12 | $271,380.38 | $3,256,564.50 |
| 9 | July 1, 2020 - June 30, 2021 | 132,921 | $16.00 | $9.00 | 12 | $276,918.75 | $3,323,025.00 |

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

| 10 | July 1, 2021 - June 30, 2022 | 132,921 | $16.50 | $9.00 | 12 | $282,457.13 | $3,389,485.50 |
| 11 | July 1, 2022 - June 30, 2023 | 132,921 | $17.00 | $9.00 | 12 | $287,995.50 | $3,455,946.00 |
| 12 | July 1, 2023 - June 30, 2024 | 132,921 | $17.50 | $9.00 | 12 | $293,533.88 | $3,522,406.50 |
| 13 | July 1, 2024 - June 30, 2025 | 132,921 | $18.00 | $9.00 | 12 | $299,072.25 | $3,588,867.00 |
| 14 | July 1, 2025 - June 30, 2026 | 132,921 | $18.50 | $9.00 | 12 | $304,610.63 | $3,655,327.50 |
| 15 | July 1, 2026 - June 30, 2027 | 132,921 | $19.00 | $9.00 | 12 | $310,149.00 | $3,721,788.00 |

Commencing on the Commencement Date, Tenant shall make Basic Rent payments on the first day of each calendar month of the Term as provided in the chart above. All other sums due under this Lease, including Additional Rent shall be payable as provided in this Lease, and any increases in Basic Rent set forth in this Lease shall occur on the dates scheduled therefor.

[a] In the event the Phase I Reduction Conditions (as defined in Section 1.1 of this Lease) are met and the Phase I Reduction Premises (as defined in Section 1.1 of this Lease) is surrendered by Tenant to Landlord in accordance with the terms and conditions of Section 1.1, then the parties agree, that prior to the Phase I Reduction Date the parties shall enter into a new amendment to this Lease restating the monthly installments of Basic Rent due and owing from and after the Phase I Reduction Date based on the total rentable area of the Premises being leased by Tenant after the reduction of the Phase I Reduction Premises (being 148,921 rentable square feet).

[b] As set forth in Section 1.5 of this Lease, Tenant is receiving an additional rent credit in lieu of a tenant improvement allowance in the amount of $1,329,210.00. During May of each of the calendar years 2013 – 2017, an amount equal to $265,842.00 out of such allowance shall be applied to the monthly installment of Basic Rent due for these months. As of June 2017 the allowance shall be completely exhausted through the application of such rental credits.

[c] The monthly installment of Basic Rent for the time period from the Date of this Lease through July 31, 2015 is calculated based on the total rentable area of the Premises consisting of a total of 168,921 square feet of rentable area (assuming that the Phase I Reduction Conditions have not been met). Effective on and as of August 1, 2015, the Phase II Reduction Premises (as defined in Section 1.2) is being released pursuant to Section 1.2. Accordingly the monthly installment of Basic Rent from and after August 1, 2015 is calculated based on a total rentable area of the Premises consisting of a total of 160,921 square feet of rentable area (which is the Premises less the Phase II Reduction Premises).

[d] The monthly installment of Basic Rent commencing on July 1, 2017 and continuing through the Term is based on the rentable area of the Premises consisting of a total of 132,921 square feet of rentable area (which is the Premises originally leased hereunder less the Phase I Reduction Premises, Phase II Reduction Premises, and Phase III Reduction Premises (as defined below)).

Security Deposit:      None.

Additional Rent:      Tenant's Proportionate Share of Excess Operating Costs and Electrical Costs.

-iii-

| | |
|---|---|
| Rent: | Basic Rent, Additional Rent, and all other sums that Tenant may owe to Landlord or otherwise be required to pay under the Lease. |
| Permitted Use: | General office use, sales, employee training, IT and for any other lawful uses. |
| Tenant's Proportionate Share: | The percentage obtained by dividing (a) the number of rentable square feet in the Premises as stated above by (b) the 227,203 rentable square feet in the Building. Landlord and Tenant stipulate that the number of rentable square feet in the Premises and in the Building set forth above is conclusive and shall be binding upon them. As of the Commencement Date Tenant's Proportionate Share shall be equal to 74.35%; provided, however, (i) if Tenant surrenders the Phase I Reduction Premises in accordance with Section 1.1 of this Lease, then the parties agree that from and after either the Phase I Reduction Date (to the extent the Phase I Reduction Conditions have been satisfied) or June 30, 2017, as applicable based on the terms of Section 1.1, Tenant's Proportionate Share shall be reduced by a total of 8.80% and (ii) provided Tenant surrenders the Phase II Reduction Premises in accordance with Section 1.2, the parties agree that from and after the Phase II Reduction Date Tenant's Proportionate Share shall be reduced by an additional total of 3.52%, and (iii) provided Tenant surrenders the Phase III Reduction Premises in accordance with Section 1.3, the parties agree that from and after June 30, 2017 Tenant's Proportionate Share shall be reduced by an additional total of 3.52%. |
| Operating Cost Expense Stop: | For the time period commencing on the Commencement Date and continuing through June 30, 2017, the Expense Stop shall be $7.75 per rentable square foot per annum. Commencing on July 1, 2017 and continuing through the remainder of the Term, the Expense Stop shall be amended to be $9.00 per rentable square foot per annum.  For example, if the estimated Operating Cost for the Premises for the calendar year 2017 is $9.50 per rentable square foot, then for January 1, 2017 until June 30, 2017, then in accordance with Section 3.2.1 of this Lease, Tenant shall pay as Operating Costs a monthly payment of $.146 (being $1/12^{th}$ of $1.75 [ being the difference between $9.50 and the Expense Stop of $7.75]) times the rentable square footage of the Premises, and commencing on July 1, 2017, Tenant shall pay as Operating Costs a monthly payment of $.042 (being $1/12^{th}$ of $0.50 [being the difference between $9.50 and the new Expense Stop of $9.00]) times the rentable square footage of the Premises. |
| Initial Liability Insurance Amount: | $1,000,000 per occurrence in primary coverage, with an additional $5,000,000 in umbrella coverage. |

| | | |
|---|---|---|
| Tenant's Address: | For all Notices: | With copies to: |
| | Ascensus, Inc.<br>Attn: Chief Financial Officer<br>200 Dryden Road<br>Dresher, PA 19025 | Fischer & Company<br>Attn: Ascensus Lease Administration<br>Galleria Tower Two<br>13455 Noel Road, Suite 1900<br>Dallas, TX 75240<br>Telephone: 972.980.7100<br>Facsimile:  972.980.7110 |
| | AJCF Corp.<br>c/o Ascensus, Inc.<br>Attn: General Counsel<br>105 Eisenhower Parkway, 4th floor<br>Roseland, NJ 07068 | and |
| | | Scarinci Hollenbeck, LLC<br>1100 Valley Brook Avenue<br>Lyndhurst, NJ 07071<br>Attn:  Victor E. Kinon, Esq. |

-iv-

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

| Landlord's Address: | For all Notices: | With a copy to: |
|---|---|---|
| | Montgomery Corporate Center, Inc.<br>c/o CB Richard Ellis, Inc.<br>1200 Liberty Ridge Drive, Suite 320<br>Wayne, PA 19087<br>Attention: Property Manager/James<br>E. Brackenrig<br>Telephone: 610.727.5918<br>Facsimile: 610.889.9168 | Montgomery Corporate Center, Inc.<br>c/o CBRE Global Investors<br>515 S. Flower Street, Suite 3100<br>Los Angeles, CA 90071<br>Attention: Michael J. Everly<br>Telephone: 213.683.4300<br>Facsimile: 213.683.4336 |

Guarantor:  AJCF Corp., a Delaware corporation as successor by merger to CGI JCF, Inc., formerly known as the Crump Group, Inc.

The foregoing Basic Lease Information is incorporated into and made a part of this Amended and Restated Lease Agreement identified above.  If any conflict exists between any Basic Lease Information and this Amended and Restated Lease Agreement, then the Amended and Restated Lease Agreement shall control.

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

## TABLE OF CONTENTS

Page

BASIC LEASE INFORMATION ................................................................................................ i

1.  Lease Grant ................................................................................................................ 1
2.  Tender of Possession ................................................................................................ 3
3.  Rent ........................................................................................................................... 3
4.  Delinquent Payment; Handling Charges .................................................................. 7
5.  Intentionally Deleted ................................................................................................ 7
6.  Landlord's Obligations ............................................................................................. 7
7.  Improvements; Alterations; Repairs; Maintenance ................................................ 10
8.  Use ............................................................................................................................ 12
9.  Assignment and Subletting ...................................................................................... 13
10. Insurance; Waivers; Subrogation; Indemnity ......................................................... 16
11. Indemnification ........................................................................................................ 18
12. Subordination; Attornment; Notice to Landlord's Mortgagee ............................... 18
13. Rules and Regulations .............................................................................................. 19
14. Condemnation .......................................................................................................... 19
15. Fire or Other Casualty ............................................................................................. 20
16. Personal Property Taxes .......................................................................................... 21
17. Events of Default ..................................................................................................... 21
18. Remedies .................................................................................................................. 22
19. Landlord's Lien ........................................................................................................ 25
20. Surrender of Premises .............................................................................................. 25
21. Holding Over ............................................................................................................ 26
22. Certain Rights Reserved by Landlord ..................................................................... 26
23. Substitution Space .................................................................................................... 27
24. Miscellaneous .......................................................................................................... 27
25. Other Provisions ...................................................................................................... 35

MONTGOMERY CORPORATE CENTER<br>200 DRYDEN ROAD<br>DRESHER, PENNSYLVANIA

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A-1 | – | Outline of Premises |
| Exhibit A-2 | | Phase I Reduction Premises |
| Exhibit A-3 | | Phase II Reduction Premises |
| Exhibit A-4 | | Phase III Reduction Premises |
| Exhibit B | – | Description of the Land |
| Exhibit C | – | Building Rules and Regulations |
| Exhibit D | – | Current Generator Location |
| Exhibit E | – | Intentionally Deleted |
| Exhibit F | – | Form of Tenant Estoppel Certificate |
| Exhibit G | – | Parking |
| Exhibit H | – | Renewal Options |
| Exhibit I | – | Right of First Refusal |
| Exhibit I-1 | – | Offered Space |
| Exhibit J | – | Lease Guaranty |

# LIST OF DEFINED TERMS

Page No.

| | |
|---|---|
| 30 Day Receipt Period | 1 |
| Additional Rent | iii |
| Amortization Interest Rate | 4 |
| Applicable Rules and Restrictions | 33 |
| Basic Rent | ii |
| Building | i |
| Casualty | 20 |
| Commencement Date | i |
| Controllable Operating Costs | 7 |
| Current Generator | 31 |
| Default Rate | 7 |
| Direct Lease | 1 |
| Disabilities Acts | 12 |
| Electrical | 8 |
| Electrical Costs | 6 |
| Elevators | 8 |
| Event of Default | 21 |
| Excess Operating Costs | 3 |
| Existing Lease | 1 |
| Expense Stop | iv |
| Fascia Sign | 33 |
| Force Majeure Delays | 27 |
| Force Majeure Event | 9 |
| GAAP | 15 |
| Guarantor | 32 |
| Hazardous Materials | 30 |
| Holiday | 8 |
| HVAC | 8 |
| Initial Liability Insurance Amount | iv |
| Land | i |
| Landlord | i |
| Landlord's Mortgagee | 18 |
| Landlord's Notice | 20 |
| Landlord's Restoration Obligations | 9 |
| Landlord's Personnel | 31 |
| Landlord's Representative | 31 |
| Lease | 1 |
| Lease Date | i |
| Modified GAAP | 4 |
| Monument Sign | 33 |
| Mortgage | 18 |
| OFAC | 32 |
| Operating Costs | 4 |
| Permitted Occupant | 15 |
| Permitted Transfer | 14 |
| Permitted Transferee | 14 |
| Permitted Use | iv |
| Phase I Reduction Conditions | 1 |
| Phase I Reduction Date | 1 |
| Phase I Reduction Premises | 1 |
| Phase I Reduction Premises Transaction Costs | 1 |

Phase II Reduction Date ...................................................................................................1
Phase II Reduction Premises ............................................................................................1
Phase III Reduction Premises ...........................................................................................2
Premises...............................................................................................................................i
Prevailing Rental Rate ......................................................................................................1
Primary Lease ..................................................................................................................18
Reconciliation Statement ..................................................................................................6
Release...............................................................................................................................31
Reletting Expenses ..........................................................................................................23
Removal Notice ................................................................................................................25
Renewal Notice .................................................................................................................1
Rent....................................................................................................................................iv
Satellite Dish ....................................................................................................................34
Second Notice .............................................................................................................13, 35
Second Service Notice ......................................................................................................9
Security Deposit ..............................................................................................................iii
Self-Help Services ............................................................................................................8
Service Self-Help Right ....................................................................................................9
Services...............................................................................................................................7
Sewer...................................................................................................................................8
Sublease Terms ..................................................................................................................1
Substitute Tenant ............................................................................................................24
Tangible Net Worth ........................................................................................................15
Taxes ...................................................................................................................................4
Telecommunications Services .........................................................................................30
Tenant ..................................................................................................................................i
Tenant's Notice ................................................................................................................20
Tenant's Proportionate Share ........................................................................................iv
Term .....................................................................................................................................i
Transfer ............................................................................................................................13
Transfer Information .......................................................................................................13
Untenantable......................................................................................................................9
Water ...................................................................................................................................8

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

## AMENDED AND RESTATED LEASE AGREEMENT

This Amended and Restated Lease Agreement (this "**Lease**") is entered into as of the Lease Date between Landlord and Tenant (as each such term is defined in the Basic Lease Information). This Lease amends and restates in its entirety that certain Lease dated January 18, 2001 between Fort Washington Phase II, L.L.C. and Bisys Plan Services LP, as amended (the "**Existing Lease**"), for the Premises.

1.        **Lease Grant.**   Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises.

1.1        **Phase I Reduction of Premises.**   Tenant is currently in the process of seeking a subtenant for a portion of the Premises consisting of 20,000 square feet of rentable area and located on the Second Floor of the Building as more specifically depicted on the floor plan attached hereto as Exhibit A-2 (the "**Phase I Reduction Premises**"). In the event that (i) Tenant locates a prospective subtenant for all of such Phase I Reduction Premises, Tenant shall notify Landlord of such prospect and shall provide Landlord with the proposed business and legal terms and conditions of the proposed sublease (the "**Sublease Terms**") together with such financial information concerning such sublease prospect as in Tenant's possession, and within thirty (30) days of such receipt ("**30 Day Receipt Period**") Landlord shall determine, in its reasonable discretion, whether or not Landlord consents to Tenant entering into such sublease, or (ii) if Landlord determines, in its sole and absolute discretion, that the terms and conditions of the proposed sublease and the identity and credit worthiness of such proposed subtenant is acceptable to Landlord, then Landlord shall notify Tenant within such 30 Day Receipt Period and shall proceed in good faith with due diligence to enter into a direct lease with such proposed subtenant for the Phase I Reduction Premises. If (i) Landlord elects, in its sole and absolute discretion, to enter into a direct lease with the prospective subtenant as set forth in the previous sentence and (ii) Landlord and such prospective subtenant mutually execute a direct lease for such Phase I Reduction Premises (the "**Direct Lease**") (the conditions in (i) and (ii) in this sentence being the "**Phase I Reduction Conditions**"), then upon the day immediately preceding the commencement of such Direct Lease (such day being the "**Phase I Reduction Date**") Tenant shall surrender the Phase I Reduction Premises to Landlord in accordance with the terms and conditions of Section 1.4 below. In the event Landlord agrees to enter into such Direct Lease as set forth above, then Landlord shall be responsible for fifty percent (50%) of the Phase I Reduction Premises Transaction Costs (as defined below) and Tenant shall be responsible for the remaining fifty percent (50%) of the Phase I Reduction Premises Transaction Costs. "**Phase I Reduction Premises Transaction Costs**" shall mean, collectively (i) any tenant improvement allowance provided to the prospective subtenant in the Direct Lease, (ii) any and all brokerage commissions payable in connection with the Direct Lease, and (iii) any other concessions provided to the prospective subtenant set forth in and limited by the Sublease Terms (provided however, Landlord and Tenant shall prorate the cost of any such concessions for any portion of the term of such direct lease which occurs after June 30, 2017). In addition, in the event Landlord agrees to enter into such Direct Lease, then the responsibility for any and all costs associated with demising and/or separating the Phase I Reduction Premises from the remaining portion of the Premises required by applicable law shall be as set forth in the Sublease Terms, which work shall be accomplished prior to the Phase I Reduction Date. In the event Landlord determines it will not enter into such Direct Lease, then Landlord shall have the right to consent (such consent not to be unreasonably withheld, delayed or conditioned) to Tenant subleasing the Phase I Reduction Premises to the prospective subtenant, and Tenant shall continue to remain liable under the Lease through June 30, 2017 for all of the obligations with respect to such Phase I Reduction Premises. In the event the Phase I Reduction Conditions have not been satisfied as of June 30, 2017, then the parties agree that effective on and as of June 30, 2017, that the portion of the Premises consisting of the Phase I Reduction Premises shall be removed and deleted from the Premises. Tenant shall be responsible for any and all costs associated with demising and/or separating the Phase I Reduction Premises from the remaining portion of the Premises in a manner reasonably acceptable to Landlord, and Tenant must accomplish all such work prior to June 30, 2017, unless required sooner pursuant to this Section 1.1

1.2        **Phase II Reduction Premises.**   Effective on and as of July 31, 2015 (the "**Phase II Reduction Date**"), Landlord and Tenant hereby agree that the portion of the Premises consisting of 8,000 rentable square feet of space and depicted on the floor plan attached as Exhibit A-3 hereto (the "**Phase II Reduction Premises**") shall be removed and deleted from the Premises and, subject to the terms and provisions of Section 1.4 below, the Tenant's responsibilities and obligations related thereto shall be null and void from and after such date. Tenant shall be responsible for surrendering the Phase II Reduction Premises from the remaining portion of the

1

703779067.9 30-Jan-13 10:47

Premises in a manner required by applicable law and Tenant must accomplish all such work prior to the Phase II Reduction Date.

        1.3    **Phase III Reduction Premises**.  Effective on and as of June 30, 2017, Landlord and Tenant hereby agree that the portion of the Premises consisting of 8,000 rentable square feet of space and depicted on the floor plan attached as Exhibit A-4 hereto (the "**Phase III Reduction Premises**") shall be removed and deleted from the Premises.  Tenant shall be responsible for surrendering the Phase III Reduction Premises from the remaining portion of the Premises in a manner required by applicable law and Tenant must accomplish all such work prior to June 30, 2017.

        1.4    **Surrender of Phase I, Phase II and Phase III Reduction Premises**.  Upon the applicable Phase I Reduction Date (but only to the extent the Phase I Reduction Conditions have been met), Phase II Reduction Date and June 30, 2017, as applicable pursuant to Sections 1.1 – 1.3 above, Tenant covenants and agrees with Landlord that Tenant shall, on or before the applicable reduction date, vacate and surrender to Landlord the Phase I Reduction Premises, Phase II Reduction Premises and Phase III Reduction Premises, subject to the following:

        1.4.1    On or before the applicable reduction date as set forth in Sections 1.1 – 1.3 above, Tenant agrees to vacate and surrender the applicable Phase I Reduction Premises, Phase II Reduction Premises and Phase III Reduction Premises in accordance with the terms and provisions of the Lease, with all of the personal property of Tenant removed therefrom, and in substantially the same condition as applicable reduction premises was tendered to Tenant, ordinary wear and tear excepted with no obligation to remove any Tenant Improvements.  Tenant hereby releases, on and as of the applicable reduction date for each of the respective reduction premises, all of its right, title and interest in, and in respect of, the applicable reduction premises.  Tenant covenants, agrees and represents that Tenant shall have no further right to use, occupy or have possession of the applicable reduction premises or any portion thereof following the applicable reduction date with respect thereto.  Notwithstanding anything herein or in the Lease to the contrary, Tenant hereby acknowledges and agrees to abide by the provisions of the Lease for any and all damages incurred by Landlord due to any holding over by Tenant in the applicable reduction premises beyond the applicable reduction date (exclusive of any indirect and/or consequential damages), and to pay rent with respect to the applicable reduction premises during any holdover period in accordance with the terms of the Lease applicable thereto.  Tenant also covenants to Landlord that Tenant will not holdover in the applicable reduction premises beyond the applicable reduction dates set forth in Sections 1.1 – 1.3 above.

        1.4.2    Subject to Section 1.4.4 below, with respect to the each of the reduction premises, Landlord agrees (i) to forever release and discharge Tenant from all obligations, covenants and agreements of Tenant arising under or in connection with the applicable reduction premises after the applicable reduction date for each set forth in Sections 1.1 – 1.3 above, and (ii) not to make any demand to or sue Tenant for obligations, covenants and agreements of Tenant arising under or in connection with the applicable reduction premises after the applicable reduction date set forth in Sections 1.1 – 1.3 above.

        1.4.3    Subject to Section 1.4.4 below, with respect to each of the reduction premises, Tenant agrees (i) to forever release and discharge Landlord from all obligations, covenants and agreements of Landlord arising under or in connection with the applicable reduction premises after the applicable reduction date for each set forth in Sections 1.1 – 1.3 above, and (ii) not to make any demand to or sue Landlord for obligations, covenants and agreements of Landlord arising under or in connection with the applicable reduction premises after the applicable reduction date set forth in Sections 1.1 – 1.3 above.

        1.4.4    Notwithstanding anything to the contrary herein contained, with respect to each of the reduction premises, Landlord and Tenant acknowledge and agree that (i) Tenant shall continue to be fully liable to Landlord to the extent set forth in the Lease for any claim for personal injury or property damage arising from events occurring on or prior to the later of the applicable reduction dates or the date Tenant actually vacates and surrenders the applicable reduction premises to Landlord in the condition required by this Section 1.4, (ii) Landlord shall continue to be fully liable to Tenant to the extent set forth in

the Lease for any claim for personal injury or property damage arising from events occurring on or prior to the applicable reduction dates set forth in Sections 1.1 – 1.3 above, (iii) each shall continue to be fully liable to the other to the extent set forth in the Lease for any payments or refunds or credits relating to any reconciliation of any Operating Costs payable under the Lease with respect to Tenant's Proportionate Share of Operating Costs attributable to periods up to the applicable reduction date with respect to each of the reduction premises, (iv) each continue to be fully liable to the other for any breach of any obligation under this Section 1.4, and (v) each of Landlord and Tenant shall continue to be fully liable to the other for such other matters that are expressly provided in the Lease to survive any such termination and surrender.

        1.4.5     With respect to each of the reduction premises, Landlord and Tenant covenant and agree with the other that either party shall make or cause to be made any further assurances of the termination and the surrender of the reduction premises as Landlord or Tenant may reasonably require from time to time.

        1.5    **Condition of Premises**.  Notwithstanding anything herein or in the Lease to the contrary, as of the Date of this Lease, Tenant is in possession of, and Landlord leases to Tenant, the Premises in its "AS-IS", "WHERE-IS" condition, and except as provided in the Lease Landlord shall have no obligation to make any improvements or refurbishments thereto throughout the Term of the Lease; provided, however, notwithstanding the foregoing, Landlord shall provide Tenant with a tenant allowance credit against Basic Rent for certain months as set forth in the Basic Rent schedule set forth above.  To Landlord's knowledge, as of the Date of this Lease, Landlord has not received written notice of any violation of any applicable laws pertaining to the Premises and the Building. The term "to Landlord's knowledge" shall mean the current actual knowledge of Mike Everly, the asset manager of Landlord's managing agent that is the person primarily responsible for overseeing the management and operation of the Building, without any duty of inquiry or investigation.

        1.6    **Existing Lease**.   Notwithstanding anything in this Lease to the contrary, any and all terms of the Existing Lease which survive the expiration or termination of the Existing Lease, including, without limitation, Section 1.6, Article 5, Section 9.1, Section 9.4, Article 19, Article 23, Article 24, Article 25, Section 27.1, Section 30.1, Section 31.4 and Section 31.5 of the Existing Lease, shall survive this amendment and restatement of the Existing Lease and shall remain in full force and effect as set forth under the Existing Lease; provided, however, as to those articles and sections to the Existing Lease listed above which by the specific language of the Existing Lease survive the termination and/or expiration thereof, said articles and sections shall only apply to events which occurred prior to the Commencement Date of this Lease.

     2.    **Tender of Possession**.  Tenant is presently in possession of the Premises.

     3.    **Rent**.

        3.1    **Payment**.  Tenant shall timely pay to Landlord Rent, without notice, demand, deduction or set off (except as otherwise expressly provided herein), by good and sufficient check drawn on a national banking association, or ACH, as the case may be, at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes imposed by any applicable governmental authority.  The obligations of Tenant to pay Rent to Landlord and the obligations of Landlord under this Lease are independent obligations.  Basic Rent, adjusted as herein provided, shall be payable monthly in advance on the first day of each calendar month.  Payments of Basic Rent for any fractional calendar month at the end of the Term shall be prorated.  Tenant shall pay to Landlord monthly installments of Additional Rent in advance on the first day of each calendar month and otherwise on the same terms and conditions described above with respect to Basic Rent.  Unless a shorter time period is specified in this Lease, all payments of miscellaneous Rent charges hereunder (that is, all Rent other than Basic Rent and Additional Rent) shall be due and payable within 30 days following Landlord's delivery to Tenant of an invoice therefor.

        3.2    **Additional Rent**.

            3.2.1    **Excess Operating Costs**.  Tenant shall pay to Landlord Tenant's Proportionate Share of Excess Operating Costs.  As used herein, **"Excess Operating Costs"** means any increases in

3

Operating Costs (defined below) for each year and partial year of the Term over the Operating Costs Expense Stop. Subject to the limits provided in Section 3.3 hereinafter Landlord may make a good faith estimate of Excess Operating Costs to be due by Tenant for any calendar year or part thereof during the Term. During each calendar year or partial calendar year of the Term after the calendar year 2012, Tenant shall pay to Landlord, in advance concurrently with each monthly installment of Basic Rent, an amount equal to Tenant's estimated Excess Operating Costs for such calendar year or part thereof divided by the number of months therein. From time to time Landlord may estimate and re-estimate (but Landlord may not re-estimate more than twice in any calendar year) the Excess Operating Costs to be due by Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Excess Operating Costs payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Excess Operating Costs as estimated by Landlord, provided that any such estimate or re estimate must be delivered to Tenant at least thirty (30) days before the Excess Operating Costs which are the subject thereof are due and payable by Tenant. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs are available for each calendar year.

        3.2.2     .**Operating Costs Defined**. The term "**Operating Costs**" means all costs, expenses and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, and maintenance of the Building and performing Landlord's obligations under this Lease, in each case, determined in accordance with Modified GAAP (defined below), including, without limitation, the following costs: (A) wages and salaries of all on-site employees at or below the grade of senior building manager engaged in the operation, maintenance or security of the Building (together with Landlord's reasonable allocation of expenses of off-site employees at or below the grade of senior building manager who perform a portion of their services in connection with the operation, maintenance or security of the Building including accounting personnel), including payroll taxes, insurance and benefits relating thereto; (B) all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Building; (C) costs for improvements made to the Building which, although capital in nature, are expected to reduce the normal operating costs, but only to the extent of such savings, (including all utility costs) of the Building, as amortized using an annual interest rate of the Prime Rate (defined below) (the "**Amortization Interest Rate**") over the useful life of such improvements as reasonably determined by Landlord using sound accounting principles to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment and sound accounting principles and provided such determination is in accordance with all applicable laws, as well as capital improvements made in order to comply with any Law promulgated by any governmental authority, or any amendment to or any interpretation hereafter rendered with respect to any existing Law that have the effect of changing the legal requirements applicable to the Project from those currently in effect, as amortized using the Amortization Interest Rate over the useful economic life of such improvements as reasonably determined by Landlord in its reasonable discretion using sound accounting principles and provided such determination is in accordance with all applicable laws; (D) cost of all utilities, except those costs that are separately submetered and payable by Tenant to Landlord pursuant to Section 3.2.4 below or paid directly by any other occupant of the Building; (E) insurance expenses, including the cost of any commercially reasonable deductibles; (F) repairs, replacements, and general maintenance of the Project; (G) Intentionally Deleted; (H) service, maintenance and management contracts and fees (payable to Landlord, Landlord's affiliate or a third-party management company; provided that any costs paid to Landlord or Landlord's affiliate for management services shall exclude amounts paid in excess of the competitive rates for management services of comparable quality rendered by persons or entities of similar skill, competence and experience for the operation of buildings of like location, size, character and quality) for the operation, maintenance, management, repair, replacement, or security of the Building (including alarm service, window cleaning, janitorial, security, landscape maintenance and elevator maintenance); and (I) Taxes. As used herein, "**Modified GAAP**" shall mean, generally accepted accounting principles applicable to commercial real estate (as modified only by 3.2.2(C) of this Lease and clause (i) in the following paragraph). As used herein, "**Taxes**" means taxes, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments now or hereafter attributable to the Building (or its operation), excluding, however, penalties and interest thereon and federal and state taxes on income. However, if the

4

present method of taxation changes so that in lieu of or in addition to the whole or any part of any Taxes, there is levied on Landlord a capital tax directly on the rents or revenues received therefrom or a franchise tax, margin tax, assessment, or charge based, in whole or in part, upon such rents or revenues for the Building, then all such taxes, assessments, or charges, or the part thereof so based, shall be deemed to be included within the term "Taxes" for purposes hereof. Taxes shall include the costs of consultants retained in an effort to lower taxes and all costs incurred in disputing any taxes or in seeking to lower the tax valuation of the Building. Taxes shall not include any assessments or levies on any additional buildings constructed on the Land on which the Building is located, any enlargement of the Building.

Notwithstanding any provision of this Lease to the contrary, Operating Costs shall not include costs for (i) capital improvements made to the Building, other than capital improvements described in Section 3.2.2(C) and except for items which are generally considered maintenance and repair items, such as painting of common areas, replacement of carpet in elevator lobbies, and the like; (ii) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (iii) interest, amortization or other payments on loans to Landlord; (iv) leasing commissions, attorneys' fees, costs and disbursements and other expenses incurred in connection with negotiations for leases with tenants, other occupants of the building, and similar costs incurred in connection with disputes between Landlord and other tenants of the Building; (v) legal expenses for services, other than those that benefit the Building tenants generally (e.g., tax disputes); (vi) renovating or otherwise improving, decorating or redecorating space for other tenants or occupants of the Building or vacant leasable space in the Building (except as provided in Section 3.2.2(C) above); (vii) federal income taxes imposed on or measured by the income of Landlord from the operation of the Building; (viii) depreciation of the Building and all equipment, fixtures improvements and facilities used in connection with the Building; (ix) material expenses in connection with services or other benefits of a type which are not standard for the Building and which are not available to Tenant without an additional charge therefor, but which are provided to another tenant or occupant without additional charge; (x) violation by Landlord of the terms and conditions of the Lease, or any applicable Law(s) (including penalties, fines and associated legal expenses), which costs would not have been incurred but for such violation by Landlord; (xi) overhead and profit increments paid to subsidiaries, partners or other Affiliates of Landlord for services on or to the Building, any appurtenant garage or the Land, to the extent that the costs of such services exceed competitive costs for such services rendered by persons or entities of similar skill, competence and experience, other than a subsidiary of Landlord; (xii) Landlord's general corporate overhead unrelated to the operation, management and repair of the Building, and all costs related to maintaining Landlord's existence as a corporation, partnership or other entity; (xiii) any compensation paid to clerks, attendants or other persons in commercial concessions, if any, operated by Landlord; (xiv) all services for which Tenant (or any other tenant of the Building) specifically reimburses Landlord, other than pursuant to an operating expense provision similar to this Section 3.2, or for which Tenant pays directly to third persons; (xv) installing, operating and maintaining any specialty service not normally installed, operated, and maintained in buildings comparable to the Building, and not necessary, at Landlord's reasonable discretion, for the operation, repair, maintenance, and providing of required services for the Building, such as an antenna, broadcasting facilities (other than life support and security systems), luncheon club, athletic or recreational club; (xvi) the acquisition and/or care of sculpture, paintings or other art; (xvii) advertising and promotional expenses incurred to publicize the Building primarily for leasing purposes; and (xviii) cost of repairs or replacements incurred by reason of fire or other casualty or condemnation; (xix) rental and/or any other payments under any ground or underlying lease or leases; (xx) any expenses for which Landlord actually receives, reimbursement from any tenant or insurance carrier; (xxi) gross receipts, unincorporated business and corporate taxes imposed or measured by the net income of Landlord from the operation of the Building; (xxii) costs of correcting original construction or design defects in the Premises or Building; (xxiii) that portion of any costs or expenses relating to the Building and to other buildings or properties owned by Landlord, which is properly allocable or attributable to such other buildings or properties; (xxiv) any home office accounting fee allocations; (xxv) costs with respect to a sale, financing or refinancing of the Building; (xxvi) depreciation of the Building or amortization of the Building in case the Building is ground leased; (xxvii) costs of defending any lawsuits with any mortgage on the Building; and (xxviii) bad debt loss, Rent loss and reserves, whether for such purposes or any other purpose; (xxix) dues of lobbying organizations, and charitable and political contributions; (xxx) costs arising from the presence of hazardous materials or substances in or about the Building; and (xxxi) costs incurred due to a default (beyond any notice and cure period) by Landlord under this Lease.

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

3.2.3    **Electrical Costs**.  Tenant shall also pay to Landlord all of the Electrical Costs. As used herein, "**Electrical Costs**" means the following costs actually incurred by Landlord which are directly attributable to the Premises:  (a) electrical services used in the operation, maintenance and use of the Premises; and (b) sales, use, excise and other taxes assessed by governmental authorities on electrical services supplied to the Premises.  As the Premises are separately metered Tenant shall pay for electricity consumed in the Premises directly to the utility supplying the same.  Any amounts for electricity consumed but not paid directly to the utility supplying the same shall be payable in monthly installments on the Commencement Date and on the first day of each calendar month after the Commencement Date.  Each installment shall be based on Landlord's reasonable business estimate of the amount due for each month. From time to time during any calendar year, Landlord may estimate or re-estimate the Electrical Costs to be due by Tenant for that calendar year and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Electrical Costs payable by Tenant shall be appropriately adjusted in accordance with the estimations, provided that any estimate or re estimate must be delivered to Tenant at least fifteen (15) days before the Electrical Costs which are the subject thereof are due and payable by Tenant.

3.2.4    **Reconciliation Statement**.  By April 30 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Operating Costs and Electrical Costs for the previous year, in each case adjusted as provided in Section 3.2.6 (the "**Reconciliation Statement**").  If Tenant's estimated payments of Excess Operating Costs or Electrical Costs under this Section 3.2 for the year covered by the Reconciliation Statement exceed Tenant's Proportionate Share of such items as indicated in the Reconciliation Statement, then Landlord shall reimburse Tenant for such excess within thirty (30) days; likewise, if Tenant's estimated payments of Excess Operating Costs, or Electrical Costs under this Section 3.2 for such year are less than Tenant's Proportionate Share of such items as indicated in the Reconciliation Statement, then Tenant shall pay Landlord such deficiency within thirty (30) days of invoice from Landlord.

3.2.5    **Gross Up**.  With respect to any calendar year or partial calendar year in which the Building is not occupied to the extent of ninety-five percent (95%) of the rentable area thereof, or Landlord is not supplying or paying for services to ninety-five percent (95%) of the rentable area thereof, the Operating Costs and Electrical Costs for such period which vary with the occupancy of the Building shall, for the purposes hereof, be increased to the amount which would have been incurred had the Building been occupied to the extent of 95% of the rentable area thereof and Landlord had been supplying or paying for services to ninety-five percent (95%) of the rentable area thereof.  For clarity, the following shall not be "grossed up":  (a) Taxes, (b) amortized capital improvements costs, (c) insurance premiums, (d) landscaping expenses, (e) Building security costs, and (f) any other fixed cost items that are not subject to fluctuation based on occupancy.

3.2.6    **Tenant Inspection Right**.  Provided no Event of Default then exists, after receiving an annual Reconciliation Statement and giving Landlord 30-days' prior written notice thereof, Tenant may inspect or audit Landlord's records relating to Additional Rent for the period of time covered by such Reconciliation Statement in accordance with the following provisions.  If Tenant fails to object to the calculation of Additional Rent on an annual Reconciliation Statement within three hundred sixty-five (365) days after the statement has been delivered to Tenant, or if Tenant fails to conclude its audit or inspection within three hundred ninety-five (395) days after the statement has been delivered to Tenant, then except for fraud Tenant shall have waived its right to object to the calculation of Additional Rent for the year in question and the calculation of Additional Rent set forth on such statement shall be final. However, if Tenant's audit reveals an error for a particular line item, Tenant may review Landlord's records for the previous year only with respect to that particular line item to determine if such error also exists for that line item in the previous year.  Tenant's audit or inspection shall be conducted where Landlord maintains its books and records, shall not unreasonably interfere with the conduct of Landlord's business, and shall be conducted only during normal business hours.  At the request of Tenant Landlord shall make copies for Tenant of all applicable documents in connection with such audit.  Tenant shall pay the cost of such audit or inspection unless the total Additional Rent for the period in question is determined to be overstated by more than four percent (4%) in the aggregate, Landlord shall pay the audit cost (not to

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

exceed ten thousand dollars ($10,000)).  Tenant may not conduct an inspection or have an audit performed more than once during any calendar year.  If such inspection or audit reveals that an error was made in the Additional Rent previously charged to Tenant, then Landlord shall refund to Tenant any overpayment of any such costs, or Tenant shall pay to Landlord any underpayment of any such costs, as the case may be, within thirty (30) days after notification thereof.  If the audit determines an expense or cost should not be included in Additional Rent, an adjustment shall be made to both the year subject to the inspection or audit and if applicable, the Base Year so costs and expenses for each year are consistently applied.  Tenant and its Auditor shall maintain the results of each such audit or inspection confidential.  Tenant shall not be permitted to use any third party to perform such audit or inspection, other than an independent firm of certified public accountants (a) reasonably acceptable to Landlord (Landlord hereby preapproves KPMG, PricewaterhouseCoopers, Deloitte, Ernst & Young and Grant Thornton as such firm for the audit), (b) which is not compensated on a contingency fee basis or in any other manner which is dependent upon the results of such audit or inspection (and Tenant shall deliver the fee agreement or other similar evidence of such fee arrangement to Landlord upon request), and (c) which agrees with Landlord in writing to maintain the results of such audit or inspection confidential.  Nothing in this Section 3.2.7 shall be construed to limit, suspend or abate Tenant's obligation to pay Rent when due, including Additional Rent.

       3.3     **Cap on Excess Operating Costs**.  For purposes of calculating Tenant's Proportionate Share of Excess Operating Costs under Section 3.2.1, the maximum increase in the amount of Controllable Operating Costs (defined below) that may be included in calculating Tenant's Proportionate Share of Excess Operating Costs for each calendar year after the calendar year 2012 shall be limited to 4.5% per calendar year on a cumulative, compounded basis; for example, the maximum amount of Controllable Operating Costs that may be included in the calculation of Tenant's Proportionate Share of Excess Operating Costs for each calendar year after the calendar year 2012 shall equal the product of the Controllable Operating Costs during the calendar year 2012 and the following percentages for the following calendar years: 104.50% for the calendar year 2013; 109.20% for the calendar year 2014; 114.12% for the calendar year 2015, etc.  Commencing on July 1, 2017 the cap on Controllable Operating Costs shall be reset and recalculated based on the Controllable Operating Costs for the calendar year 2017.  Therefore, for example, the maximum amount of Controllable Operating Costs that may be included in the calculation of Tenant's Proportionate Share of Excess Operating Costs for each calendar year after the calendar year 2017 shall equal the product of the Controllable Operating Costs during the calendar year 2017 and the following percentages for the following calendar years: 104.50% for the calendar year 2018; 109.20% for the calendar year 2019; 114.12% for the calendar year 2020, etc.  However, any increases in Operating Costs not recovered by Landlord due to the foregoing limitation shall be carried forward into succeeding calendar years during the Term (subject to the foregoing limitation) to the extent necessary until fully recouped by Landlord.  "**Controllable Operating Costs**" means all Operating Costs except for Taxes, insurance, utilities and snow removal.

       4.     **Delinquent Payment; Handling Charges**.  All past due payments required of Tenant hereunder shall bear interest from the date due until paid at the lesser of ten percent (10%) per annum or the maximum lawful rate of interest (such lesser amount is referred to herein as the "**Default Rate**"); additionally, Landlord, in addition to all other rights and remedies available to it, may charge Tenant a late fee equal to the greater of (a) two percent (2%) of the delinquent payment, or (b) two hundred fifty dollars ($250), to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency.  In no event, however, shall the charges permitted under this Section 4 or elsewhere in this Lease, to the extent they are considered to be interest under applicable Law, exceed the maximum lawful rate of interest.  Notwithstanding the foregoing, the late fee referenced above shall not be charged with respect to the first occurrence (but not any subsequent occurrence) during any 12-calendar month period that Tenant fails to make payment when due, until five (5) days after Landlord delivers written notice of such delinquency to Tenant.

       5.     **Intentionally Deleted**.

       6.     **Landlord's Obligations**.

       6.1     **Services**.  Landlord shall furnish to Tenant the following services (the "**Services**"), generally consistent with the level of service provided in comparable office buildings in the same geographic

7

market:  (1) hot and cold water at points of supply for general use of the tenants in the Building ("**Water**"); (2) heating, ventilation and refrigerated air conditioning ("**HVAC**") as appropriate, at such temperatures and in such amounts as are standard for comparable buildings with comparable densities and heat loads in the vicinity of the Building (not to exceed the current HVAC system's capacity existing as of the Lease Date); (3) janitorial service to the Premises five (5) days per week, other than holidays, for Building-standard installations and such window washing as may from time to time be reasonably required but not less frequently than once per calendar year; (4) elevators for ingress and egress to the floors on which the Premises are located, in common with other tenants, provided that Landlord may reasonably limit the number of operating elevators during non-business hours and Holidays ("**Elevators**"); and (5) electrical current during normal business hours for equipment that does not require more than 110 volts and whose electrical energy consumption does not exceed normal office usage including but not limited to all normal business office machines and equipment (including but not limited to personal computers) ("**Electrical**"); (6) replacement of Building standard light bulbs, bathroom paper towels, toilet paper, bathroom soap and other related bathroom supplies and materials and (7) wastewater and sewer services ("**Sewer**").  **Landlord shall not be liable in damages ([whether under theories of strict liability, tort or otherwise] to Tenant or any Tenant Party for failure to provide any security service in respect of the Premises or the Building)**.  If Tenant desires any of the services specified in this Section 6.1(2):  (A) at any time other than between 8:00 a.m. and 6:00 p.m. on weekdays and between 8:00 a.m. and 1:00 p.m. on Saturdays (in each case other than Holidays), or (B) on Sundays or Holidays, then such services shall be supplied to Tenant upon the written request by Tenant delivered to Landlord's designated property manager before 3:00 p.m. on the business day preceding such extra usage, and Tenant shall pay to Landlord the cost of such services (which shall not be included in Tenant's Proportionate Share of Operating Costs or Electrical Costs) and any actual costs incurred by Landlord or its agents relating to such services within thirty (30) days after Landlord has delivered to Tenant an invoice therefor.  However, with respect to HVAC services on Saturdays, in order to conserve energy and reduce Additional Rent, Tenant shall notify Landlord whether or not Tenant desires HVAC services to the Premises on Saturdays by 3:00 p.m. on the immediately preceding business day.  If Tenant so notifies Landlord that Tenant desires such HVAC services on Saturday, Landlord shall provide such HVAC service during the Building's standard hours on Saturday (as described above) at no additional HVAC charge.  If Tenant desires HVAC services on Saturdays in excess of the Building's standard hours on Saturdays, then Landlord shall provide such services at the After Hours HVAC Charge for such additional hours in excess of the Building's standard hours.  The After Hours HVAC Charge shall be the actual cost incurred by Landlord for After Hours HVAC without markup, which is currently $27.00 per zone per floor, subject to change as reasonably determined by Landlord.  As used in this Lease, the term "**Holiday**" shall mean any day, other than a Saturday or Sunday, on which banks in Philadelphia, Pennsylvania, are closed for business.  The term "**Self-Help Services**" shall mean collectively only the following Services: Water, HVAC, Elevators, Electrical and Sewer.

      6.2    **Excess Utility Use**.  Landlord shall not be required to furnish electrical power for equipment that requires more than 110 volts or other equipment whose electrical energy consumption exceeds normal office usage.  If Tenant's requirements for or consumption of electricity exceed the electricity to be provided by Landlord as described in Section 6.1, Landlord shall, at Tenant's expense, make reasonable efforts to supply such service through the then-existing feeders and risers serving the Building and the Premises, provided the additional use of such feeders and risers caused by Tenant's excess electrical requirements do not adversely affect Landlord's ability to provide reasonable electrical service to the balance of the Building (as determined by Landlord in the exercise of its reasonable discretion); and Tenant shall pay to Landlord the cost of such service within thirty (30) days after Landlord has delivered to Tenant a detailed invoice therefor.  Landlord may determine the amount of such additional consumption and potential consumption by any verifiable method, including installation of a separate meter in the Premises installed, maintained, and read by Landlord, at Tenant's expense.  Tenant shall not install any electrical equipment requiring special wiring or requiring voltage in excess of 110 volts unless approved in advance by Landlord, which approval shall not be unreasonably withheld delayed or conditioned.  Tenant shall not install any electrical equipment requiring wattage in excess of Building capacity (five (5) watts per rentable square foot) unless approved in advance by Landlord, which approval may be withheld in Landlord's sole discretion.  The use of electricity in the Premises shall not exceed the capacity of existing feeders and risers to or wiring in the Premises.  Any risers or wiring required to meet Tenant's excess electrical requirements shall, upon Tenant's written request, be installed by Landlord, at Tenant's cost, if, in Landlord's judgment, the same are necessary and shall not cause permanent damage to the Building or the Premises, cause or create a dangerous or hazardous condition, entail excessive or unreasonable alterations, repairs, or expenses, adversely affect Landlord's ability to provide reasonable service to the balance of the Building, or  interfere with or disturb other tenants of the Building.  If Tenant uses machines or equipment in the Premises which affect (more than to a *de minimis* extent) the temperature otherwise

8

maintained by the air conditioning system or otherwise overload any utility as determined and verified by the Building's engineer, Landlord may install supplemental air conditioning units or other supplemental equipment in the Premises, and the cost thereof, including the cost of installation, operation, use, and maintenance, in each case plus an administrative fee of ten percent (10%) of such cost, shall be paid by Tenant to Landlord within thirty (30) days after Landlord has delivered to Tenant an invoice therefor.

      6.3    **Restoration of Services; Abatement**.  Landlord shall use reasonable efforts to promptly restore any Service required of it under Section 6.1 that becomes unavailable; however, such unavailability shall not render Landlord liable for any damages caused thereby, be a constructive eviction of Tenant, constitute a breach of any implied warranty, or, except as provided in the next sentence, entitle Tenant to any abatement of Tenant's obligations hereunder.  If, however, the unavailability of any such service results in more than fifty percent (50%) of the Premises being reasonably unusable, and is in fact not used, by any Tenant Party ("**Untenantable**") for a period of five (5) consecutive days following Landlord's receipt from Tenant of a written notice regarding such unavailability, the restoration of which is within Landlord's reasonable control and such unavailability was not caused by a Tenant Party or a casualty, then Tenant shall, as its exclusive remedy, be entitled (i) to a reasonable abatement of Rent for that portion of the Premises that is Untenantable for each consecutive day (after such five-day period) that the Premises is Untenantable and (ii) exercise the Service Self-Help Right as set forth in this Section 6.3.  In the event there is an interruption of any such Service and the restoration of such Service is within Landlord's reasonable control (the "**Landlord's Restoration Obligations**") and such unavailability was not caused by a Tenant Party, a Force Majeure Event or a Casualty, then Landlord agrees to promptly (within 48 hours) commence restoration of such Service after receipt of written notice from Tenant identifying the Service which has been interrupted.  If Landlord fails to promptly commence to restore such Services within a reasonable period of time depending on the Service that is interrupted (but in all events within 48 hours), then Tenant shall provide a second written notice ("**Second Service Notice**") to Landlord providing at the top of such Second Service Notice in bold, all-capital letters in 16-point font as follows: "**LANDLORD'S FAILURE TO COMMENCE RESTORATION OF THE INTERRUPTED SERVICES WITHIN THREE (3) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE MAY RESULT IN TENANT COMMENCING SELF-HELP RIGHTS UNDER SECTION 6.3 OF THE LEASE.**"

In the event (i) Self-Help Services are unavailable in more than fifty percent (50%) of the Premises and as a result the Premises are Untenantable, (ii) the restoration of such Self-Help Service is within Landlord's reasonable control and such unavailability was not caused by a Tenant Party, a Force Majeure Event or a Casualty, and (iii) Landlord has failed to commence efforts to restore such Self-Help Service within three (3) business days after receipt of the Second Service Notice, then Tenant shall have the right, but not the obligation (a "**Service Self-Help Right**"), to commence such Landlord Restoration Obligations and to diligently pursue such Landlord Restoration Obligations until completion.  A "**Force Majeure Event**" shall mean any delays, in the performance of Landlord's obligations or Tenant obligations hereunder (other than the payments of money) when caused by any of the following events to the extent beyond the applicable party's reasonable control: strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, delays related to governmental restrictions, delays related to governmental controls, delay in issuance of permits past the number of days normally required for permitting for projects within the vicinity of the Building (provided that Landlord complies with industry standard in the submittal process of such permits to the appropriate governmental authority), enemy or hostile governmental action, acts of terrorism, and civil commotion.  Notwithstanding anything herein to the contrary, the following limitations shall apply with the Service Self-Help Right under this Section 6.3: (i) in connection with Tenant's Service Self-Help Right hereunder, in no event shall Tenant be permitted to enter into any premises or space being leased by any third party, (ii) Tenant's Service Self-Help Right shall not apply to any circumstance involving a condemnation or Casualty (it being acknowledged that Sections 14 and 15 shall respectively apply to each such circumstance), and (iii) if Tenant exercises any Service Self-Help Right, it shall do so in its own name and on its own account and not as an agent of Landlord.  If Tenant properly exercises any Service Self-Help Right, then Landlord shall reimburse Tenant for the reasonable out-of-pocket costs incurred by Tenant in connection with such Service Self-Help Right within thirty (30) days after Landlord's receipts of all invoices (and other backup documentation reasonably requested by Landlord) evidencing such costs.

      6.4    **Repair and Maintenance by Landlord**.  Landlord shall maintain and repair (a) the common areas of the Building and Land, (b) Building's Structure, roof (including membrane, insulation and

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

flashing), exterior walls and waterproofing of all exterior walls and windows, parking lot replacement, Building core and slab, (c) the core portions of the Building's Systems, (d) branch lines of Building-standard electrical systems, (e) branch lines and duct work for Building-standard HVAC systems in the Premises and in the Common Areas of the Building, (f) restroom plumbing branch lines and Building-standard restroom fixtures, in each case, in existing restrooms available for general use of all occupants on the floor (for the avoidance of doubt, Landlord shall not be responsible to maintain or repair private or executive restrooms, non-Building-standard restroom fixtures, or plumbing lines or fixtures for breakrooms or kitchens), (g) the parking areas repairs and replacements, and (h) other exterior areas of the Building, including driveways, alleys, landscape and grounds of the Building and utility lines in a good condition, consistent with the operation of similar class office buildings in the market in which the Building is located, including maintenance, repair and replacement of the exterior of the Building (including painting), landscaping, lawn maintenance, sprinkler systems and any items normally associated with the foregoing.  All costs in performing the work described in this Section shall be included in Operating Costs except to the extent excluded by Section 3.2.  Landlord shall be responsible for performing alterations to the Building's Structure required by applicable Law except where occasioned by Tenant's unpermitted use (other than use of the Premises for the Permitted Use in compliance with the terms of this Lease) of the Premises or alterations to the Premises constructed by Tenant (which alterations shall be made by Landlord at Tenant's sole cost and expense and on the same terms and conditions as Landlord performed repairs).  Notwithstanding anything to the contrary contained herein, Landlord shall, in its commercially-reasonable discretion, determine whether, and to the extent, repairs or replacements are the appropriate remedial action.

      7.      **Improvements; Alterations; Repairs; Maintenance**.

          7.1      **Improvements; Alterations**.  Improvements to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord, which approval shall be governed by the provisions set forth in this Section 7.1 and shall not be unreasonably withheld, conditioned and/or delayed.  No alterations or physical additions in or to the Premises (including the installation of systems furniture or other equipment or personal property that affects or otherwise connects to the Building's Systems) may be made without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned, and/or delayed; however, Landlord may withhold its consent to any alteration or addition that would adversely affect (in the reasonable discretion of Landlord) the (1) Building's Structure or the Building's Systems (including the Building's restrooms or mechanical rooms), (2) exterior appearance of the Building, (3) the Building's common areas or elevator lobby areas, including their appearance, or (4) provision of services to other occupants of the Building.  However, Landlord shall not unreasonably withhold its consent to alterations to the elevator lobbies in the Premises located on floors leased entirely by Tenant (other than the first floor of the Building), so long as such alterations are professional in appearance and the quality of materials and finishes is similar to that found on other newly renovated single-tenant floor elevator lobbies in the Building.  Tenant shall not paint or install lighting or decorations, signs, window or door lettering, or advertising media of any type visible from the exterior of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned and/or delayed.  Notwithstanding the foregoing, Tenant shall not be required to obtain Landlord's consent for repainting, recarpeting, or other alterations, tenant improvements, or physical additions to the Premises which are cosmetic in nature totaling less than one hundred thousand dollars ($100,000) in any single instance or series of related alterations performed within a six-month period (provided that Tenant shall not perform any improvements, alterations or additions to the Premises in stages as a means to subvert this provision), in each case provided that (A) Tenant delivers to Landlord written notice thereof, a list of contractors and subcontractors to perform the work (and certificates of insurance for each such party) and any plans and specifications therefor prior to commencing any such alterations, additions, or improvements (for informational purposes only so long as no consent is required by Landlord as required by this Lease), (B) the installation thereof does not require the issuance of any building permit or other governmental approval, or involve any core drilling or the configuration or location of any exterior or interior walls of the Building, and (C) such alterations, additions and improvements will not affect (i) the Building's Structure or the Building's Systems, (ii) the provision of services to other Building tenants, or (iii) the Building's common areas or the exterior of the Building, including their appearance.  All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all Laws; Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's

10

acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance.

        7.2    **Repair and Maintenance by Tenant**.  Tenant shall maintain the Premises in a clean, safe, and operable condition, and shall not permit or allow to remain any waste or damage to any portion of the Premises.  If the Premises include, now or hereafter, one or more floors of the Building in their entirety, all corridors and restroom facilities located on such full floor(s) shall be considered to be a part of the Premises.  Additionally, subject to Landlord's obligations under Section 6 above, Tenant, at its sole expense, shall repair, replace and maintain in good condition and in accordance with all Laws and the equipment manufacturer's suggested service programs, (a) all portions of the Premises and Tenant's Off-Premises Equipment, (b) plumbing branch lines and fixtures for breakrooms and kitchens, non-Building standard restroom fixtures, and private or executive restrooms within the Premises, (c) non-Building standard electrical and HVAC branch lines and duct work within the Premises and (d) all improvements and systems exclusively serving the Premises.  Tenant shall repair or replace, subject to Landlord's direction and supervision, any damage to the Building caused by a Tenant Party, subject to and except as provided in Section 10.3.  If (1) Tenant fails to commence to make such repairs or replacements within thirty (30) days after the Tenant has notice from Landlord of the occurrence of such damage and thereafter diligently pursue the completion thereof, or (2) notwithstanding such diligence, Tenant fails to complete such repairs or replacements within thirty (30) days after the occurrence of such damage (unless Tenant reasonably needs more than thirty (30) days to complete such repairs, then as long as Tenant is acting in good faith and with diligence, Tenant may have up to ninety (90) days to complete such repairs, provided that if Tenant does not timely commence such repairs or complete such repairs, then Landlord may make the same at Tenant's cost.  If any such damage occurs outside of the Premises, and Landlord's insurance does not cover the same, then Landlord may elect to repair such damage at Tenant's expense, rather than having Tenant repair such damage.  The cost of all maintenance, repair or replacement work performed by Landlord under this Section 7, in each case plus any actual costs incurred by Landlord or its agents relating to such maintenance, repair or replacement work performed, shall be paid by Tenant to Landlord within thirty (30) days after Landlord has invoiced Tenant therefor.

        7.3    **Performance of Work**.  All work described in this Section 7 shall be performed only by Landlord or by contractors and subcontractors reasonably approved in writing by Landlord and only in accordance with plans and specifications approved by Landlord in writing.  If Tenant requests that Landlord supervise any work described in this Section 7, Tenant shall pay to Landlord a construction management fee equal to five percent (5%) of the hard cost of such work.  If Tenant has not requested that Landlord supervise any work described in this Section 7, but such work affects the Building's Systems or Building's Structure thus requiring Landlord's participation, Tenant shall pay to Landlord a construction management fee equal to five percent (5%) of the hard cost of that portion of the work affecting the Building's Systems or Building's Structure.  Tenant shall cause all contractors and subcontractors to procure and maintain insurance coverage naming Landlord, Landlord's Mortgagee (if any), Landlord's property management company and Landlord's asset management company as additional insureds against such risks, in such reasonable amounts, and with such companies as Landlord may reasonably require.  Tenant shall provide Landlord with the identities, mailing addresses and telephone numbers of all persons performing work or supplying materials prior to beginning such construction and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Laws.  All such work shall be performed in accordance with all Laws and in a good and workmanlike manner so as not to damage the Building (including the Premises, the Building's Structure and the Building's Systems) and shall use materials of a quality that is at least equal to the quality designated by Landlord as the minimum standard for the Building, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Building.  Landlord may designate reasonable rules, regulations and procedures for the performance of all such work in the Building and, to the extent reasonably necessary to avoid disruption to the occupants of the Building, shall have the right to designate the time during the business day when such work may be performed.  All such work which may affect the Building's Structure or the Building's Systems must be approved by the Building's engineer of record, at Tenant's expense and, at Landlord's election, must be performed by Landlord's usual contractor for such work.  All work affecting the roof of the Building must be performed by Landlord's roofing contractor and no such work will be permitted if it would void or reduce the warranty on the roof.  Upon completion of any work described in this Section 7, Tenant shall furnish Landlord with accurate reproducible "as-built" CADD files of the improvements as constructed.

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

7.4    **Mechanic's Liens**.  All work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party shall be deemed authorized and ordered by Tenant only, and Tenant shall cause to be removed or bond around any mechanic's or construction liens to be filed against the Premises or the Building in connection therewith.  Upon completion of any such work, Tenant shall deliver to Landlord final lien waivers from all contractors, subcontractors and materialmen who performed such work.  If such a lien is filed, then Tenant shall, within thirty (30) days after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Premises, the Building or any interest of Landlord therein or the imposition of a civil or criminal fine with respect thereto), either (1) pay the amount of the lien and cause the lien to be released of record, or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord.  If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within twenty (20) days after Landlord has invoiced Tenant therefor.  Landlord and Tenant acknowledge and agree that their relationship is and shall be solely that of "landlord-tenant" (thereby excluding a relationship of "owner-contractor," "owner-agent" or other similar relationships).  Accordingly, all materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter contracting with Tenant, any contractor or subcontractor of Tenant or any other Tenant Party for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same.  Nothing herein shall be deemed a consent by Landlord to any liens being placed upon the Premises, the Building or Landlord's interest therein due to any work performed by or for Tenant or deemed to give any contractor or subcontractor or materialman any right or interest in any funds held by Landlord to reimburse Tenant for any portion of the cost of such work.  Tenant shall defend, indemnify and hold harmless Landlord and its agents and representatives from and against all claims, demands, causes of action, suits, judgments, damages and expenses (including attorneys' fees) in any way arising from or relating to the failure by any Tenant Party to pay for any work performed, materials furnished, or obligations incurred by or at the request of a Tenant Party.  This indemnity provision shall survive termination or expiration of this Lease.

7.5    **Access**.  Subject to the Building rules and regulations attached as <u>Exhibit C</u> hereto and the other provisions of this Lease (including Section 8 hereof) and subject to (i) all reasonable security measures as may be imposed by Landlord from time to time and as are generally applicable to tenants of the Building and their invitees; and (ii) restrictions on access recommended or imposed as a result of an emergency, Tenant will be provided access to the Premises 24 hours per day, seven days per week.

8.    **Use**.  Tenant shall use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, and occupancy of the Premises and will not commit waste, overload the Building's Structure or the Building's Systems or subject the Premises to use that would damage the Premises.  The population density within the Premises as a whole shall at no time exceed 5.6 persons for each one thousand (1,000) rentable square feet in the Premises; however, such population density may from time to time exceed such number on a temporary basis for meetings, conferences and other events of a temporary nature.  Tenant may use the Premises twenty-four (24) hours per day, seven (7) days per week (subject to the terms and provisions of this Lease, including Paragraph 7.5 above); however such hours of operation shall not affect (a) the normal Building hours specified in Section 6.1 above, or (b) Tenant's obligation to request and pay for, among other things, after hours HVAC service as provided in Section 6.1.  Notwithstanding anything in this Lease to the contrary, as between Landlord and Tenant, (1) Tenant shall bear the risk of complying with all applicable Laws including Title III of the Americans With Disabilities Act of 1990, any state laws governing handicapped access or architectural barriers, and all rules, regulations, and guidelines promulgated under such laws, as amended from time to time (the "**Disabilities Acts**") in the Premises, and (2) except for the obligation of Tenant under clause (1) above, Landlord shall bear the risk of complying with all applicable Laws including the Disabilities Acts in the common areas of the Building, other than compliance that is necessitated by the use of the Premises for other than the Permitted Use or as a result of any alterations or additions (which risk and responsibility shall be borne by Tenant).  The Premises shall not be used for any use which is disreputable, creates extraordinary fire hazards, or results in an increased rate of insurance on the Building or its contents, or for the storage of any Hazardous Materials (other than *de minimis* quantities found in typical office or cleaning supplies [e.g., photocopier toner] and then only in compliance with all Laws and in a reasonable and prudent manner).  Landlord represents and warrants that the use of the Premises by Tenant for the Permitted Use will not cause any increase in insurance premiums on the Building.  Tenant shall not use any substantial portion of the Premises for a "call center," any other telemarketing use, or any credit processing use.  If,

12

because of a Tenant Party's acts or omissions, the rate of insurance on the Building or its contents increases, Tenant shall pay to Landlord the amount of such increase on demand, and acceptance of such payment shall not waive any of Landlord's other rights.  If Tenant fails to cease or remediate such acts within five (5) days after Landlord's request that Tenant do so, then such acts or omissions shall be an Event of Default.  Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building.  **Tenant hereby waives any claims it may have against Landlord for failure to provide any services in addition to what is otherwise required under this Lease.**

9. <u>**Assignment and Subletting**</u>.

9.1 <u>**Transfers**</u>.  Except as provided in Section 9.8, Tenant shall not, without the prior written consent of Landlord, (1) assign, transfer, or encumber this Lease or any estate or interest herein, whether directly or by operation of law, (2) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current direct or indirect control of Tenant, (4) sublet any portion of the Premises, (5) grant any license, concession, or other right of occupancy of any portion of the Premises, (6) permit the use of the Premises by any parties other than Tenant or a Permitted Occupant, or (7) sell or otherwise transfer, in one or more transactions, a majority of Tenant's assets (any of the events listed in Section 9.1(1) through 9.1(7) being a "<u>**Transfer**</u>").

9.2 <u>**Consent Standards**</u>.  Landlord shall not unreasonably withhold, condition and/or delay its consent to any assignment or subletting of the Premises, provided that the proposed transferee (1) is creditworthy, as reasonably determined by Landlord considering, along with all other reasonably relevant factors, the size of the space subject to the assignment or sublease in question and Tenant's creditworthiness at the time of the Lease Date, (2) will use the Premises for the Permitted Use (thus, excluding, without limitation, uses for credit processing and telemarketing) and will not use the Premises in any manner that would conflict with any exclusive use agreement or other similar agreement entered into by Landlord with any other tenant of the Building, (3) will not use the Premises or the Building in a manner that would materially increase the pedestrian or vehicular traffic to the Premises or the Building, (4) is not a governmental or quasi-governmental entity, or subdivision or agency thereof, (5) is not another occupant of the Building or an Affiliate of such occupant (provided that Landlord has adequate space in the Building to accommodate the proposed transferee), (6) is not currently and has not in the past five (5) years been involved in litigation with Landlord or any of its Affiliates, (7) meets Landlord's reasonable standards for tenants of the Building and is otherwise compatible with the character of the occupancy of the Building, and (8) is not a person or entity with whom Landlord is then, or has been within the three-month period prior to the time Tenant seeks to enter into such assignment or subletting, negotiating to lease space in the Building or any Affiliate of any such person or entity; otherwise, Landlord may withhold its consent in its sole discretion.  Additionally, Landlord may withhold its consent in its sole discretion to any proposed Transfer if any Event of Default by Tenant then exists.

9.3 <u>**Request for Consent**</u>.  If Tenant requests Landlord's consent to a Transfer, then, at least ten (10) business days prior to the effective date of the proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer, copies of the proposed documentation, and the following information about the proposed transferee:  name and address of the proposed transferee and any entities and persons who own, control or direct the proposed transferee; reasonably satisfactory information about its business and business history; its proposed use of the Premises; banking, financial, and other credit information sufficient to enable Landlord to determine the proposed transferee's creditworthiness (collectively the "<u>**Transfer Information**</u>").  Upon Landlord's receipt of Tenant's request and Landlord's receipt of any requested information as set forth above, Landlord shall respond within ten (10) business days of its consent or rejection, subject to the terms of this Article 9.  In the event Landlord does not respond within such ten (10) business day period, then Tenant shall provide a second written notice ("<u>**Second Notice**</u>") to Landlord, which shall include all of the Transfer Information, providing at the top of such notice in bold, all-capital 16-point font as follows: "**IF LANDLORD FAILS TO RESPOND TO THIS SECOND NOTICE WITHIN FIVE (5) BUSINESS DAYS AFTER LANDLORD'S RECEIPT OF THIS NOTICE, THEN, PURSUANT TO SECTION 9.3 OF THE LEASE, LANDLORD SHALL BE DEEMED TO HAVE CONSENTED TO THE TRANSFER REQUESTED IN THIS SECOND NOTICE.**"  In the event Landlord does not respond within five (5) business days after receiving the Second Notice, then Landlord's consent shall be deemed granted to the Transfer requested in the Second Notice.  Concurrently with

13

Tenant's notice of any request for consent to a Transfer, Tenant shall reimburse Landlord immediately upon request for its actual attorneys' fees and other actual expenses incurred in connection with considering any request for consent to a Transfer (which shall not exceed two thousand dollars ($2,000) for subleases).

9.4     **Conditions to Consent**.  If Landlord consents to a proposed Transfer, then Tenant shall deliver to Landlord a written agreement from transferee whereby transferee expressly assumes Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer, as provided in the transfer agreement, for the period of the Transfer.  Notwithstanding anything in this Lease to the contrary, no Transfer shall release Tenant from its obligations under this Lease.  Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers and no subtenant of any portion of the Premises shall be permitted to further sublease any portion of its subleased space.  If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer, then Landlord, in addition to its other remedies, may collect directly from such transferee all rents becoming due to Tenant and apply such rents against Rent.  Tenant authorizes its transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an uncured Event of Default hereunder.  Tenant shall pay for the cost of any demising walls or other improvements necessitated by a proposed subletting or assignment.

9.5     **Attornment by Subtenants**.  Each sublease by Tenant hereunder shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be (1) liable for any previous act or omission of Tenant under such sublease, (2) subject to any counterclaim, offset or defense that such subtenant might have against Tenant, (3) bound by any previous modification of such sublease not approved by Landlord in writing or by any rent or additional rent or advance rent which such subtenant might have paid for more than the current month to Tenant, and all such rent shall remain due and owing, notwithstanding such advance payment, (4) bound by any security or advance rental deposit made by such subtenant which is not delivered or paid over to Landlord and with respect to which such subtenant shall look solely to Tenant for refund or reimbursement, or (5) obligated to perform any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment.  Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this Section 9.5.  The provisions of this Section 9.5 shall be self-operative, and no further instrument shall be required to give effect to this provision.

9.6     **Cancellation**.  Intentionally Deleted.

9.7     **Additional Compensation**.  While no Event of Default exists, Tenant shall pay to Landlord, immediately upon receipt thereof, fifty percent (50%) of the excess of (1) all compensation received by Tenant for a Transfer less the actual out-of-pocket costs reasonably incurred by Tenant with unaffiliated third parties (i.e., brokerage commissions and tenant finish work) in connection with such Transfer (such costs shall be amortized on a straight-line basis over the term of the Transfer in question) over (2) the Rent allocable to the portion of the Premises covered thereby.  While any Event of Default exists, Tenant shall pay to Landlord, immediately upon receipt thereof, one hundred percent (100%) of the excess of (A) all compensation received by Tenant for a Transfer over (B) the Rent allocable to the portion of the Premises covered thereby.

9.8     **Permitted Transfers**.  Notwithstanding Section 9.1, Tenant may Transfer all or part of its interest in this Lease or all or part of the Premises (a "**Permitted Transfer**") to the following types of entities (a "**Permitted Transferee**") without the written consent of Landlord:

9.8.1     an Affiliate of Tenant;

14

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

9.8.2    any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant, or its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions governing merger and consolidation of business entities, so long as (1) Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation; and (2) the Tangible Net Worth of the surviving or created entity is not less than the Tangible Net Worth of Tenant as of the Lease Date;

9.8.3    any corporation, limited partnership, limited liability partnership, limited liability company or other business entity acquiring all or substantially all of Tenant's assets, so long as (1) Tenant's obligations hereunder are assumed by the entity acquiring such assets; and (2) such entity's Tangible Net Worth after such acquisition is not less than the Tangible Net Worth of Tenant as of the Lease Date; or

9.8.4    any transfer of the ownership, equity interest, or voting rights in Tenant (including a change in the then current direct or indirect control of Tenant) in connection with an equity, capital or debt raise so long as the Tangible Net Worth of Tenant is not less than the Tangible Net Worth of Tenant as of the Lease Date.

Tenant shall promptly notify Landlord of any such Permitted Transfer.  Tenant shall remain liable for the performance of all of the obligations of Tenant hereunder, or if Tenant no longer exists because of a merger, consolidation, or acquisition, the surviving or acquiring entity shall expressly assume in writing the obligations of Tenant hereunder.  Additionally, the Permitted Transferee shall comply with all of the terms and conditions of this Lease, including the Permitted Use, and the use of the Premises by the Permitted Transferee may not violate any other agreements affecting the Premises or the Building, Landlord or other tenants of the Building.  No later than ten (10) days after the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (A) copies of the instrument effecting any of the foregoing Transfers (confidential information unrelated to the Transfer of the Lease and the satisfaction of the above criteria may be redacted), (B) documentation establishing Tenant's satisfaction of the requirements set forth above applicable to any such Transfer, and (C) evidence of insurance as required under this Lease with respect to the Permitted Transferee.  Upon Tenant's request, Landlord shall execute a confidentiality agreement in a form reasonably acceptable to Landlord and Tenant relating to those items contained in the documentation described in clauses (A) and (B) above that Tenant reasonably deems to be confidential information.  The occurrence of a Permitted Transfer shall not waive Landlord's rights as to any subsequent Transfers.  "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises.  Any subsequent Transfer by a Permitted Transferee shall be subject to the terms of this Section 9.

9.9    **Permitted Occupants**.

9.9.1    Notwithstanding anything in this Section 9 to the contrary, Tenant may permit its subsidiaries, Affiliates and consultants, and such other entities with which Tenant is conducting business (each a "**Permitted Occupant**") to occupy and use a portion of Premises without the written consent of Landlord, subject to the following conditions: (a) the Permitted Occupant is of character, is engaged in a business, and uses the Premises in keeping with Tenant and the Permitted Use, (b) the use of the Premises by the Permitted Occupant may not violate any other agreements affecting the Premises, the Building, Landlord or other tenants of the Building, (c) the use and occupancy by the Permitted Occupant is otherwise expressly subject to, and the Permitted Occupant must comply with, all of the terms, covenants, conditions and obligations on Tenant's part to be observed and performed under this Lease (other than Tenant's obligation to pay Basic Rent and Additional Rent under this Lease), including the requirement to obtain insurance in the requisite amounts and to indemnify, defend and hold Landlord harmless for any Loss (defined below) or other liabilities resulting from the use and operations contemplated by this Section 9.9, (d) any violation of any provision of this Lease by the Permitted Occupant shall be deemed to be a default by Tenant under such provision, (e) the space provided by the Permitted Occupant shall not be separately demised from the Premises, (f) the Permitted Occupant shall have no recourse against Landlord

whatsoever on account of any failure by Landlord to perform any of its obligations under this Lease or on account of any other matter, (g) all notices required of Landlord under this Lease shall be forwarded only to Tenant in accordance with the terms of this Lease and in no event shall Landlord be required to send any notices to any Permitted Occupant, (h) in no event shall any use or occupancy of any portion of the Premises by any Permitted Occupant release or relieve Tenant from any of its obligations under this Lease, (i) each such Permitted Occupant shall be deemed an invitee of Tenant, and Tenant shall be fully and primarily liable for all acts and omissions of such Permitted Occupant as fully and completely as if such Permitted Occupant was an employee of Tenant; (j) in no event shall the occupancy of any portion of the Premises by any Permitted Occupant be deemed to create a landlord/tenant relationship between Landlord and such Permitted Occupant or be deemed to vest in Permitted Occupant any right or interest in the Premises or this Lease, and, in all instances, Tenant shall be considered the sole tenant under the Lease notwithstanding the occupancy of any portion of the Premises by any Permitted Occupant, and (k) for any and all entities that are a Permitted Occupant with which Tenant is conducting business, such Permitted Occupants shall not occupy more than 10,000 rentable square feet of space in the Premises.

9.9.2     Any equipment or other property of a Permitted Occupant in the Building shall be subject to Section 16 (Personal Property Taxes) and Section 20 (Surrender of Premises) of this Lease. However, nothing in this Section 9.9 shall diminish Landlord's rights elsewhere in this Lease or imply that Landlord has any duties to any Permitted Occupant. Tenant acknowledges that Landlord shall have no responsibility or liability for the allocation or use of the Premises between Tenant and any Permitted Occupant. No disputes among Tenant and any Permitted Occupant shall in any way affect the obligations of Tenant hereunder.

10.     **Insurance; Waivers; Subrogation; Indemnity**.

10.1     **Tenant's Insurance**. Effective as of the earlier of (1) the date Tenant enters or occupies the Premises, or (2) the Commencement Date, and continuing throughout the Term, Tenant shall maintain the following insurance policies: (A) commercial general liability insurance (including property damage, bodily injury and personal injury coverage) in amounts of $1,000,000 per occurrence in primary coverage and $2,000,000 in the aggregate, with an additional $5,000,000 in umbrella coverage or, following the expiration of the initial Term, such other amounts as Landlord may from time to time reasonably require, which greater amounts shall not exceed the minimum insurance limits than being required of similar tenants by comparable landlords in the Fort Washington-Horsham submarket of Pennsylvania (and, if the use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy [e.g., the sale, service or consumption of alcoholic beverages], Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter [including liquor liability, if applicable] in such amounts as Landlord may reasonably require), insuring Tenant (and naming as additional insureds Landlord, Landlord's property management company, Landlord's asset management company and, if requested in writing by Landlord, Landlord's Mortgagee), against all liability for injury to or death of a person or persons or damage to property arising from the use and occupancy of the Premises and (without implying any consent by Landlord to the installation thereof) the installation, operation, maintenance, repair or removal of Tenant's Off-Premises Equipment, (B) all-risk insurance (including, but not limited to, sprinkler leakage, flood (including wind driven water coverage) windstorm and collapse coverage) covering the full value of all alterations and improvements and betterments in the Premises, naming Landlord and Landlord's Mortgagee as additional loss payees as their interests may appear, (C) all-risk insurance covering the full value of all furniture, trade fixtures and personal property (including property of Tenant or others) in the Premises or otherwise placed in the Building by or on behalf of a Tenant Party (including Tenant's Off-Premises Equipment), (D) contractual liability insurance in an amount of $3,000,000 per occurrence (but only if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy), (E) commercial auto liability insurance (if applicable) covering automobiles owned, hired or used by Tenant in carrying on its business with limits not less than $1,000,000 combined single limit for each accident, insuring Tenant (and naming as additional insureds Landlord, Landlord's property management company, Landlord's asset management company and, if requested in writing by Landlord, Landlord's Mortgagee), (F) to the extent required by Law, worker's compensation insurance, and (G) business interruption insurance in an amount equal to or greater than 12 months of Tenant's actual, sustained probable loss. Notwithstanding the foregoing, Tenant may elect to self-insure for (i) the risks that would be covered under the

business interruption insurance required above and (ii) coverage in excess of $25,000 for sewer back-up under Tenant's all-risk policy. Tenant's insurance shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy. Tenant shall furnish to Landlord certificates of such insurance and such other reasonable evidence of the maintenance of all insurance coverages required hereunder at least ten (10) days prior to the earlier of the Commencement Date or the date Tenant enters or occupies the Premises (in any event, within ten (10) days of the effective date of coverage), and at least fifteen (15) days prior to each renewal of said insurance, and Tenant shall reasonably endeavor to obtain a written obligation on the part of each insurance company to notify Landlord at least thirty (30) days before cancellation or a material change of any such insurance policies. All such insurance policies shall be in form reasonably satisfactory to Landlord and issued by companies with an A.M. Best rating of A+:VII or better. However, no review or approval of any insurance certificate or policy by Landlord shall derogate from or diminish Landlord's rights or Tenant's obligations hereunder. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof, plus an administrative fee of ten percent (10%) of such cost.

       10.2    **Landlord's Insurance**. Throughout the Term of this Lease, Landlord shall maintain, as a minimum, the following insurance policies: (1) cause of loss/special form (formerly "all risk") property insurance for the Building's replacement value (excluding property required to be insured by Tenant), less a commercially-reasonable deductible if Landlord so chooses, and (2) commercial general liability insurance in an amount of not less than $3,000,000. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary. The cost of all insurance carried by Landlord with respect to the Building shall be included in Operating Costs. The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder. Any insurance required to be maintained by Landlord may be taken out under a blanket insurance policy or policies covering other buildings, property or insureds in addition to the Building and Landlord. In such event, the costs of any such blanket insurance policy or policies shall be reasonably allocated to the Building and the other properties covered by such policy or policies as reasonably determined by Landlord and included as part of Operating Costs. Landlord shall provide contractual liability insurance in the amount of $3,000,000 per occurrence (but only if such contractual liability insurance is not already included in Landlord's commercial general liability policy).

       10.3    **No Subrogation; Waiver of Property Claims**. Landlord and Tenant each waives any claim it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against (or permitted to be self-insured against) under any insurance policy of the types described in this Section 10 that covers the Building, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against under the terms hereof, **regardless of whether the negligence of the other party caused such Loss (defined below)**. Additionally, Tenant waives any tort claim it may have against Landlord for any Loss to the extent such Loss is caused by a terrorist act, and Tenant acknowledges that nothing in this Lease creates any obligation of Landlord to maintain terrorism insurance. Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party. Notwithstanding any provision in this Lease to the contrary, neither Landlord, nor Tenant nor its or their agents, employees and contractors shall be liable to the other party or to any party claiming by, through or under such party for (and each party hereto hereby releases the other and its or their servants, agents, contractors, employees and invitees from any claim or responsibility for) any damage to or destruction, loss, or loss of use, or theft of any property of the other party located in or about the Building, caused by casualty, theft, fire, third parties or any other matter or cause, **regardless of whether the negligence of any party caused such loss in whole or in part**. Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for damage to, any property of any Tenant Party located in or about the Building. The provisions of this Section 10.3 shall survive the expiration or earlier termination of this Lease.

       10.4    **Business Interruption**. Landlord shall not be responsible for, and Tenant releases and discharges Landlord from, and Tenant further waives any right of recovery from Landlord for, any loss for or from

business interruption or loss of use of the Premises suffered by Tenant in connection with Tenant's use or occupancy of the Leased Premises, **even if such loss is caused solely or in part by the negligence of Landlord**.

10.5     **Tenant Waiver**.  Except as otherwise expressly set forth in this Lease or except to the extent caused by the negligence or willful misconduct of Landlord and/or Landlord's agents, employees, contractors and/or affiliates, Landlord shall not be liable to Tenant or Tenant's agents, employees or contractors for any damage, injury, loss, compensation or claim based on, arising out of, or resulting from any cause including, but not limited to, the following:  repairs to any portion of the Premises or the Building; interruption in the use of the Premises; any accident or damage resulting from the use or operation (by Tenant or any other person or persons) of elevators, or of heating, cooling, electrical or plumbing equipment or apparatus; the termination of this Lease by reason of the destruction of the Premises or the Building; any fire, robbery, theft, mysterious disappearance and/or any other casualty; the actions of any other tenants of the Landlord or of any other person or persons; any leakage in any part or portion of the Premises or Building, or from water, rain or snow that may leak, into, or flow from, any part of the Premises or the Building, or from drains, pipes or plumbing fixtures in the Building; or any act, omission, or any neglect of Tenant or Tenant's agents, employees or contractors in the use of the Premises or Building by Tenant or Tenant's agents, employees or contractors.  Notwithstanding the foregoing, but subject to the waiver set forth in Section 11.3, Landlord shall not be released from liability to Tenant or Tenant's agents, employees or contractors for any damage, injury, loss, compensation or claim caused by the willful misconduct or negligence of Landlord or its agents, contractors or employees.

11.     **Indemnification**.

11.1     Subject to the waiver set forth in Section 11.3, Tenant hereby indemnifies and holds Landlord harmless from all expenses, costs (including reasonable attorney fees and disbursements), loss, liability and claims based on, arising out of or resulting from:  (i) any act, omission or neglect of Tenant, its agents, employees, contractors or invitees or the use of the Premises (or any part thereof) by Tenant, its agents, employees, contractors or invitees, (ii) any Tenant installation, alteration, or other work performed by Tenant in the Premises. Tenant's obligation to indemnify Landlord hereunder shall include the duty to defend against any claims asserted by reason of such loss, damage or injury and to pay any judgments, settlements, costs, fees and expenses, including reasonable attorneys fees, incurred in connection therewith.  Subject to the waiver set forth in Section 11.3, Landlord shall be responsible for and hereby indemnifies and holds Tenant harmless from any and all liability for any loss of or damage to person (including death resulting therefrom) or property occurring in, on or about the Building, based on, arising out of or resulting from any act, omission or neglect of Landlord, or Landlord's agents, contractors, employees or invitees.  Landlord's obligation to indemnify Tenant hereunder shall include the duty to defend against any claims asserted by reason of such loss, damage or injury and to pay any judgments, settlements, costs, fees and expenses, including reasonable attorneys fees, incurred in connection therewith. The indemnities set forth in this Section 12.1 shall survive the expiration or termination of this Lease.

12.     **Subordination; Attornment; Notice to Landlord's Mortgagee**.

12.1     **Subordination**.  This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (each, a "**Mortgage**"), or any ground lease, master lease, or primary lease (each, a "**Primary Lease**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any such Mortgage, beneficiary under any such deed of trust, or the lessor under any such Primary Lease is referred to herein as a "**Landlord's Mortgagee**").  As of the Lease Date, there is no existing mortgage lien filed against the Building.  If in the future, Landlord places all or any part of the Premises under a Mortgage, then, provided that Tenant agrees to negotiate in good faith and to be reasonable in its comments to any future subordination, non-disturbance and attornment agreement, Landlord agrees to obtain a subordination, non-disturbance and attornment agreement from any future Landlord's Mortgagee, in a form reasonably acceptable to Tenant and such Landlord's Mortgagee.  Any Landlord's Mortgagee may elect, at any time, unilaterally, to make this Lease superior to its Mortgage, Primary Lease, or other interest in the Premises by so notifying Tenant in writing.

12.2     **Attornment**.  Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or

18

otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

        12.3    **Notice to Landlord's Mortgagee**. Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee a reasonable opportunity to perform Landlord's obligations hereunder not to exceed thirty (30) days from the date of such notice.

        12.4    **Landlord's Mortgagee's Protection Provisions**. If Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be: (1) liable for any act or omission of any prior lessor (including Landlord); (2) bound by any rent or additional rent or advance rent which Tenant might have paid for more than the current month to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (3) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (4) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (5) subject to the defenses which Tenant might have against any prior lessor (including Landlord); and (6) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease, (B) relate to periods of time following the acquisition of the Building by Landlord's Mort agee, and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee a reasonable opportunity to cure the event giving rise to such offset event. Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own fee simple title to the Building. Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan.

        13.    **Rules and Regulations**. Tenant shall comply with the rules and regulations of the Building which are attached hereto as Exhibit C, which shall be enforced by Landlord in a non discriminatory manner. Landlord may, from time to time, change such rules and regulations for the safety, care, or cleanliness of the Building and related facilities, provided that such changes are applicable to all tenants of the Building and will not unreasonably interfere with Tenant's use of the Premises  All such changes to the rules and regulations must be in writing and sent to Tenant at the Premises. Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

        14.    **Condemnation**.

        14.1    **Permanent Taking**. If the whole or substantially the whole (which shall be deemed to be more than 60% of the rentable square footage) of the Building or the Premises should be taken for any public or quasi-public use, by right of eminent domain or otherwise, or should be sold in lieu of condemnation, then this Lease shall terminate as of the date when physical possession of the Building or the Premises is taken by the condemning authority. If less than the whole or substantially the whole of the Building is taken, Landlord or Tenant may terminate this Lease in the event that the Building requires demolition. If (i) thirty-five (35%) percent or more of the Premises is taken or sold or (ii) or ten (10%) percent or more of the Tenant's parking allocation (unless alternative parking spaces are provided) is taken or sold, Tenant may terminate this Lease by giving written notice thereof to Landlord in which event this Lease shall terminate as of the date when physical possession of such portion of the Building is taken by the condemning authority. If this Lease is not so terminated upon any such taking or sale, the Basic Rent payable hereunder shall be equitably adjusted by multiplying the annual Basic Rent then in effect by a fraction, the numerator of which is the number of square feet of rentable square feet of the Premises after the taking and the denominator of which is the number of rentable square feet in the Premises prior to such taking, and Tenant's Proportionate Share shall be adjusted to reflect any change in the rentable square feet of the Premises and rentable square feet of the Building, and Landlord shall, at Landlord's sole cost and expense, restore the Building and the Premises to substantially their former condition. All amounts awarded upon a taking of any part or

19

all of the Building shall belong to Landlord or the holder of any mortgage affecting the Premises, and Tenant shall not be entitled to and expressly waives all claim to any such compensation including, without limitation, any claim for the value of the unexpired portion of this Lease.

        14.2   **Tenant Claim**.  Tenant may make a claim in such proceedings for its personalty, trade fixtures and moving expenses.

        14.3   **Temporary Taking**.  If all or any portion of the Premises becomes subject to a taking for any public or quasi-public use, by right of eminent domain or otherwise, for a limited period of time, this Lease shall remain in full force and effect, and Tenant shall continue to perform all of the terms, conditions and covenants of this Lease, excluding the payment of Basic Rent and all other amounts required hereunder for that portion of the Premises subject to the Taking, during the pendency of such Taking.  Landlord shall be entitled to receive the entire award (if any award is issued) for any such temporary Taking.

      15.    **Fire or Other Casualty**.

        15.1   **Casualty**.  If the Premises or any part thereof shall be damaged by fire or other casualty ("**Casualty**"), Tenant shall give prompt written notice thereof to Landlord.  In the event of any Casualty to the Building, Landlord shall, within ninety (90) days of such Casualty, provide Tenant with a written notice (the "**Landlord's Notice**") in accordance with this Section 15.  In case the Building shall be so damaged that substantial alteration or reconstruction of the Building shall, in Landlord's reasonable opinion, be required (whether or not the Premises shall have been damaged by such Casualty), or in the event of any substantial uninsured loss to the Building, or the mortgagee of any mortgage affecting the Premises does not make insurance proceeds available, Landlord may at its option terminate the Lease by so notifying Tenant as part of Landlord's Notice.  For the purposes of the preceding sentence, the term "substantial" shall mean damage to more than thirty-five percent (35%) of the gross square footage of the entire Building whether or not any portion of the Premises is damaged.  If Landlord does not elect to terminate the Lease, Landlord's Notice shall specify whether in Landlord's judgment, the Premises or those portions of the Building affecting the use and enjoyment of the Premises can be reconstructed within three hundred sixty (360) days from the occurrence of such fire or casualty.  If Landlord's Notice indicates that such reconstruction of the Premises or those portions of the Building affecting the use and enjoyment of the Premises shall exceed three hundred sixty (360) days and Landlord does not elect to terminate the Lease as provided in Landlord's Notice, Tenant shall have the right, to be exercised within thirty (30) days after receipt of Landlord's Notice, to elect, by notice to Landlord, to cancel this Lease, (hereinafter called "**Tenant's Notice**").  In the event the Lease is not terminated by either Landlord or Tenant as hereinabove permitted, Landlord shall commence and proceed with reasonable diligence to restore the damaged portions Building.  If Landlord indicates in its Landlord's Notice that the portions of the Building affecting the use and occupancy of the Premises can be restored within three hundred sixty (360) days and such portions of the Building are not restored within three hundred sixty (360) days after the date of such Casualty (except for force majeure delays or Tenant delays), or if Landlord in Landlord's Notice indicates that it will take a period longer than three hundred sixty (360) days to restore said portion of the Building and said portions are not restored within such longer period (except for force majeure delays or Tenant delays), then this Lease and the Term hereof may at the election of Tenant be terminated by notice in writing from Tenant to Landlord, providing Tenant serves such notice on Landlord within thirty (30) days after expiration of the three hundred sixty (360) day restoration period or such longer period, if applicable, which notice shall be effective thirty (30) days after the giving of such notice if the Building has not been restored by that date.  If the Building has been restored within said thirty (30) day period from the date the notice is given, the Lease shall continue in full force and effect.  If the Lease is terminated by either Landlord or Tenant as above permitted, Landlord and Tenant thereafter shall have no further obligation or claim, one to the other, this Lease shall be deemed null and void and of no further force and effect.  Landlord shall not be liable for any inconvenience, loss of business or annoyance to Tenant or damage to the business of Tenant resulting in any way from such damage or the repair thereof, except for the abatement of Basic Rent and Additional Rent as set forth in Section 15.4 below.  During the period of any reconstruction undertaken by Landlord, Tenant shall be responsible to remove its personal property, fixtures and equipment from the damaged area prior to Landlord's institution of reconstruction work.  Landlord shall have no liability to Tenant with respect to any damage, loss or theft of any such personal property, fixtures and equipment not so removed.

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

15.2   **Waiver**.  Tenant waives the benefit of any statute providing for an abatement of rent or termination of this Lease in the event of a Casualty or other damage or destruction of the Building and agrees that Tenant will not be relieved of the obligations to pay the Basic Rent or any Additional Rent in case of a Casualty or other damage to or destruction of the Building, except as otherwise expressly provided by this Lease.

15.3   **Governmental Approvals**.  Notwithstanding any of the foregoing provisions to the contrary, Landlord's obligation to repair the damage and restore and rebuild the Building and/or the Premises pursuant to this Section 15 shall be conditioned on such restoration being then lawfully permitted and Landlord being granted all necessary approvals from any and all governmental authorities, including, without limitation, the township, county, state or federal governments, any agency, subdivision or department of any of the foregoing or any other quasi-governmental agency.

15.4   **Abatement of Rent**.  Notwithstanding the foregoing, if the Premises are damaged by a Casualty, then Basic Rent and Additional Rent for the portion of the Premises rendered Untenantable by the damage shall be abated from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be).

16.   **Personal Property Taxes**.  Tenant shall be liable for, and shall pay prior to delinquency, all taxes levied or assessed against personal property, furniture, or fixtures placed by Tenant in the Premises or in or on the Building.  If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property, Landlord shall promptly notify Tenant thereof.  If Tenant fails to pay such amount within ten (10) days following such notice, and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within thirty (30) days following written request therefor, the part of such taxes for which Tenant is primarily liable hereunder; however, Landlord shall not pay such amount if Tenant notifies Landlord that it will contest the validity or amount of such taxes before Landlord makes such payment, and thereafter diligently proceeds with such contest in accordance with Law and if the non-payment thereof does not pose a threat of loss or seizure of the Building or interest of Landlord therein or impose any fee or penalty against Landlord.

17.   **Events of Default**.  Each of the following occurrences shall be an "**Event of Default**":

17.1   **Payment Default**.  Tenant's failure to pay Rent within five (5) days after Landlord has delivered written notice to Tenant that the same is due; however, an Event of Default shall occur hereunder without any obligation of Landlord to give any notice if Tenant fails to pay Rent when due and, during the twelve (12) month interval preceding such failure, Landlord has given Tenant written notice of failure to pay Rent on two or more occasions;

17.2   **Abandonment**.  Tenant abandons or vacates more than fifty percent (50%) of the rentable square feet on any floor of the Building without providing written notice to Landlord at least ten (10) business days prior to the date on which Tenant so vacates and fails to pay Rent.  For the avoidance of doubt, Landlord acknowledges that Tenant may "go dark" at the Premises, so long as Tenant provides ten (10) business days prior notice to Landlord, coordinates any move-out procedures with Landlord's property manager and Tenant performs all of its other obligations under this Lease, including the timely payment of all Rent;

17.3   **Estoppel; Subordination; Financial Reports**.  Tenant fails to provide any estoppel certificate, documentation regarding the subordination of this Lease or financial reports after Landlord's written request therefor pursuant to Section 24.6, Section 12.1, and Section 24.20 respectively, and such failure shall continue for fifteen (15) days after Landlord's second written notice thereof to Tenant;

17.4   **Insurance**.  Tenant fails to procure and maintain the insurance policies and coverages required under Section 10.1 or Tenant fails to deliver to Landlord (within ten (10) days after Landlord's demand therefor) evidence of such insurance policies and coverages as required under Section 10.1;

21

17.5 **Mechanic's Liens**. Tenant fails to pay and release of record, or diligently contest and bond around, any mechanic's or construction lien filed against the Premises or the Building for any work performed, materials furnished, or obligation incurred by or at the request of a Tenant Party, within the time and in the manner required by Section 7.4;

17.6 **Other Defaults**. Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of more than thirty (30) days after Landlord has delivered to Tenant written notice thereof; however, if such failure cannot be cured within such 30-day period (thus excluding, for example, Tenant's obligation to provide Landlord evidence of Tenant's insurance coverage) and Tenant commences to cure such failure within such 30-day period and thereafter diligently pursues such cure to completion, then such failure shall not be an Event of Default unless it is not fully cured within an additional one hundred twenty (120) days after the expiration of the 30-day period; and

17.7 **Insolvency**. The filing of a petition by or against Tenant (the term "**Tenant**" shall include, for the purpose of this Section 17.7, any guarantor of Tenant's obligations hereunder) (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; (4) for the reorganization or modification of Tenant's capital structure; or (5) in any assignment for the benefit of creditors proceeding; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within ninety (90) days after the filing thereof.

18. **Remedies**. Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions:

18.1 If **any** Event of Default occurs, Landlord may, notwithstanding the fact that Landlord may have other remedies hereunder or at law or in equity, by notice to Tenant, designate a date, not less than ten (10) days after the giving of such notice, on which this Lease shall terminate; and thereupon, on such date the Term of this Lease and the estate hereby granted shall expire and terminate with the same force and effect as if the date specified in such notice were the Termination Date and all rights of Tenant hereunder shall expire and terminate but Tenant shall remain liable as provided in this Lease, and Landlord shall have the right to remove all persons, goods, fixtures and chattels from the Premises pursuant to legal process.

18.2 If this Lease is terminated as provided in Section 18.1, or as permitted by law, Tenant shall peaceably quit and surrender the Premises to Landlord, and Landlord may, without further notice, enter upon, re-enter, possess and repossess the same by summary proceedings, ejectment or other legal proceeding, and again have, repossess and enjoy the same as if this Lease had not been made, and in any such event neither Tenant nor any person claiming through or under Tenant shall be entitled to possession or to remain in possession of the Premises, and Landlord at its option shall forthwith, notwithstanding any other provision of this Lease, be entitled to recover from Tenant as and for damages either:

(i) the excess, if any of (1) all Basic Rent and Additional Rent (conclusively presuming the Additional Rent to be the same as was payable for the calendar year immediately preceding such termination) reserved hereunder for the unexpired portion of the Term over (2) the aggregate fair rental value of the Premises at the time of termination for such unexpired portion of the Term, discounted at the rate of five (5%) percent per annum to then present worth plus an amount equal to any Reletting Expenses (as defined in Paragraph (ii) of this Section 19.2); or

(ii) amounts equal to the Basic Rent and Additional Rent which would have been payable by Tenant from time to time had this Lease not so terminated, or had Landlord not so re-entered the Premises, payable on the dates that such payments would have otherwise been payable following such termination and until the Termination Date; provided, however, that if Landlord shall relet the Premises during said period, Landlord shall credit Tenant with the net rent received by Landlord from such reletting, such net rents to be determined by first deducting in a lump sum (and not on an amortized basis) from the gross rents as and when received by Landlord from such

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

reletting, the expenses incurred or paid by Landlord in terminating this Lease or in re-entering the Premises and in securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises for new tenants, brokers' commissions, attorney fees, and all other reasonable expenses properly chargeable against the Premises and the rental therefrom (collectively, "**Reletting Expenses**"), it being understood that any such reletting may be for a period shorter or longer than the remaining term of this Lease, but in no event shall Tenant be entitled to receive any excess of such rents over the sums payable by Tenant to Landlord hereunder, nor shall Tenant be entitled in any suit for the collection of damages pursuant to this Subsection to a credit in respect of any net rents from a reletting, except to the extent that such net rents are actually received by Landlord.  If the Premises or any part thereof should be relet in combination with other space or otherwise, then proper apportionment on a square foot basis (for equivalent space) shall be made of the rent received from such reletting and of the expenses of reletting.  Suit or suits for the recovery of such damages, or any installments of such damages, may be brought by Landlord from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the term of this Lease would have expired if it had not been so terminated under the provisions of Section 16.1, or under any provision of law, or had Landlord not re-entered the Premises.

18.3     Nothing herein contained shall be construed to limit or preclude recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant.  Nothing herein contained shall be construed to limit or prejudice the right of Landlord to prove and obtain as liquidated damages by reason of the termination of this lease or re-entry on the Premises for the default of Tenant under this lease, an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved whether or not such amount be greater, equal to, or less than any of the sums referred to in Section 19.2.  Nothing contained herein shall limit or prejudice the right of Landlord, in any bankruptcy or reorganization or insolvency proceedings, to prove for and obtain as damages by reason of such termination or by reason of disaffirmance of this Lease by Tenant, an amount equal to the maximum allowed by any bankruptcy or reorganization or insolvency proceedings, or to prove for and obtain as damages by reason of such termination, an amount equal to the maximum allowed by any statute or rule of law whether such amount be greater, equal to, or less than any of the sums referred to in Section 19.2.

18.4     If Tenant shall default, beyond any applicable notice and/or grace period, in the keeping, observance or performance of any covenant, agreement, term, provision or condition herein contained, Landlord, without thereby waiving such default and exclusive of Tenant's obligation to pay Rent, may perform the same for the account and at the expense of Tenant (a) immediately or at any time thereafter and without notice in the case of emergency or in case such default will result in (i) a violation of any law, rule or regulation of any governmental authority or any insurance policy maintained by Landlord, or (ii) the imposition of any lien, charge or encumbrance against all or any portion of the Premises or the Building, and (b) in any other case if such default continues for a period of fifteen (15) days after the date of the giving by Landlord to Tenant of a notice of Landlord's intention to perform the same.  All reasonable costs and expenses incurred by Landlord (plus interest thereon at the Default Rate, until repaid by Tenant) in connection with any such performance by it for the account of Tenant and also all costs and expenses, including reasonable counsel fees and disbursements incurred by Landlord in any action or proceeding (including any summary dispossess proceeding) brought by Landlord to enforce any obligation of Tenant and/or right of Landlord under this Lease or right of Landlord in or to the Premises after and during a Tenant Default, shall be paid by Tenant to Landlord, as Additional Rent, upon demand.

18.5     No right or remedy conferred upon or reserved to Landlord shall be exclusive of any other right or remedy, and any right and remedy shall be cumulative and in addition to every other right or remedy given hereunder or now or hereafter existing at law.  The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement or to exercise any right, power or remedy contained in this Lease shall not be construed as a waiver or relinquishment thereof for the future.  A receipt by Landlord of any installment of Basic Rent or Additional Rent with knowledge of the breach of any covenant or agreement contained in this Lease shall not be deemed a waiver of such breach, and shall not be deemed to have been waived unless expressed in writing and signed by Landlord.  Landlord shall be entitled to accept less than the full amount due on account of

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

Basic Rent and Additional Rent without thereby waiving the right to collect the balance due. Landlord shall be entitled, to the extent permitted by applicable law, to injunctive relief in case of the violation, or attempted or threatened violation, of any covenant, agreement, condition or provision of this Lease or to a decree compelling performance or any covenant, agreement, condition or provision of this Lease, or to any other remedy allowed Landlord by law.

18.6    Tenant hereby waives all right of redemption to which Tenant or any person claiming under Tenant might be entitled by law now or hereafter in force.

18.7    Tenant expressly waives to Landlord the benefit to Tenant of 68 P.S. Section 250.501, being Section 501 of that Act, approved April 6, 1951, entitled "Landlord and Tenant Act of 1951", as may be amended from time to time, requiring notice to quit upon the expiration of the Term of this Lease or at the expiration of any extension or renewal thereof, or upon any earlier termination of this Lease, as herein provided. Tenant covenants and agrees to vacate, remove from and deliver upon and surrender possession of the Premises to Landlord upon the expiration of the Term of this Lease or at the expiration of any extension or renewal thereof, or upon any earlier termination of this Lease, as herein provided, without such notice, in the condition required herein. Without limitation of or by the foregoing, Tenant waives any and all demand, notice of intention and notices of action and proceedings which may be required by law to be given or taken prior to any entry or re-entry, summary proceedings, ejectment or otherwise, by Landlord, except for such notice as expressly provided in this Lease.

18.8    In no event shall either Landlord or Tenant be liable as a result of its default hereunder for any indirect or consequential damages of the other party.

18.9    **No Waiver**.  Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default. No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term. Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

18.10    **Cumulative Remedies**.  Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity, (2) shall be cumulative, and (3) may be pursued successively or concurrently as Landlord may elect. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future. Additionally, Tenant shall defend, indemnify and hold harmless Landlord, Landlord's Mortgagee and their respective representatives and agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees) arising from Tenant's failure to perform its obligations under this Lease; however, Landlord's remedies with respect to termination of the Lease or Tenant's right to possess the Premises shall be as set forth in Section 18 above.

18.11    **Mitigation of Damage**.  The parties agree any duty imposed by Law on Landlord to mitigate damages after a default by Tenant under this Lease shall be satisfied in full if Landlord uses reasonable efforts to lease the Premises to another tenant (a "**Substitute Tenant**") in accordance with the following criteria: (1) Landlord shall have no obligation to solicit or entertain negotiations with any Substitute Tenant for the Premises until 30 days following the date upon which Landlord obtains full and complete possession of the Premises, including the relinquishment by Tenant of any claim to possession of the Premises by written notice from Tenant to Landlord; (2) Landlord shall not be obligated to lease or show the Premises on a priority basis or offer the Premises to any prospective tenant when other space in the Building is or soon will be available; (3) Landlord shall not be obligated to lease the Premises to a Substitute Tenant for less than the current fair market value of the Premises, as determined by Landlord in its sole discretion, nor will Landlord be obligated to enter into a new lease for the Premises under other terms and conditions that are unacceptable to Landlord under Landlord's then-current leasing policies; (4) Landlord shall not be obligated to enter into a lease with a Substitute Tenant: (A) whose use would violate any restriction, covenant or requirement contained in the lease of another tenant in the Building; (B) who does not meet Landlord's reasonable standards for tenants of the Building and is otherwise not compatible with the

24

character of the occupancy of the Building; (C) whose use would require any addition to or modification of the Premises or Building in order to comply with applicable Law, including building codes; (D) who does not have, in Landlord's sole but reasonable opinion, the creditworthiness to be an acceptable tenant; (E) that is a governmental entity; or (F) that does not meet Landlord's reasonable standards for tenants of the Building or is otherwise incompatible with the character of the occupancy of the Building, as reasonably determined by Landlord; and (5) Landlord shall not be required to expend any amount of money to alter, remodel or otherwise make the Premises suitable for use by a Substitute Tenant unless:  (A) Tenant pays any such amount to Landlord prior to Landlord's execution of a lease with such Substitute Tenant (which payment shall not relieve Tenant of any amount it owes Landlord as a result of Tenant's default under this Lease); or (B) Landlord, in Landlord's sole discretion, determines any such expenditure is financially prudent in connection with entering into a lease with the Substitute Tenant.

19.     **Landlord's Lien**.  Intentionally Deleted.

20.     **Surrender of Premises**.  No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord.  At the expiration or termination of this Lease or Tenant's right to possess the Premises, Tenant shall (a) deliver to Landlord the Premises broom-clean with all improvements located therein in good repair and condition (except for reasonable wear and tear and except for condemnation and Casualty damage, as to which Sections 14 and 15 shall control), free of any liens or encumbrances and free of Hazardous Materials placed on the Premises by Tenant during the Term; (b) deliver to Landlord all keys to the Premises and all access cards to the Building; (c) remove all unattached trade fixtures, furniture, and personal property placed in the Premises or elsewhere in the Building by a Tenant Party and unattached equipment located in the Premises (but, following an early termination of the Lease or termination of Tenant's right to possess the Premises, Tenant may not remove any such item which was paid for, in whole or in part, by Landlord unless Landlord requires (prior to the time of installation) or approves in writing of such removal); (d) leave in place, without additional payment to Tenant or credit against Rent, any and all cabling (including conduit), whether located in the Premises or elsewhere in the Building, installed by or on behalf of a Tenant Party, and Tenant covenants that such cabling shall be left in a neat and safe condition in accordance with the requirements of all applicable Laws, including the National Electric Code or any successor statute, and shall be terminated at both ends of a connector; and (e) remove such alterations, additions, improvements, and Tenant's Off-Premises Equipment as Landlord may have required prior to the installation of the same; however, Tenant shall not be required to remove any addition or improvement to the Premises or the Building if Landlord has specifically agreed in writing that the improvement or addition in question need not be removed.  Tenant shall repair all damage caused by the removal of the items described above.  In connection with Landlord's review and approval of any of Tenant's proposed alterations, additions or improvements to the Premises, Landlord shall notify Tenant in writing, contemporaneously with Landlord's notice of approval to Tenant with respect to the improvements in question, that Landlord will require Tenant to remove such alterations which are not reasonably found in office buildings prior to the expiration of the Term.  If Landlord determines any requested improvements must be removed prior to the expiration of the Term, then Landlord shall notify Tenant thereof in writing and such improvements, as designated by Landlord to Tenant in writing, must be removed by Tenant at the expiration of the Term or termination of the Lease or Tenant's right to possess the Premises.  However, if Tenant submits plans and specifications to Landlord for proposed alterations, additions or improvements to the Premises and delivers a Removal Notice (defined below) to Landlord contemporaneously with such submission to Landlord, and Landlord fails to notify Tenant that Tenant will be required to remove such alterations, additions or improvements to the Premises at the expiration of the Term, Landlord may not request such removal at the expiration of the Term.  A "**Removal Notice**" means a written notice from Tenant to Landlord that conspicuously states in bold, uppercase typeface that Tenant will not be required to remove the alterations, additions or improvements in question at the end of the Term unless, contemporaneously with Landlord's notice of approval to Tenant with respect to the improvements in question, Landlord notifies Tenant in writing that Landlord will require Tenant to remove such alterations prior to the expiration of the Term.  If Tenant fails to remove any of the items required to be removed by Tenant, Landlord may, at Landlord's option, (A) deem such items to have been abandoned by Tenant, the title thereof shall immediately pass to Landlord at no cost to Landlord, and such items may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without any obligation to account for such items; any such disposition shall not be considered a strict foreclosure or other exercise of Landlord's rights in respect of the security interest granted hereunder or otherwise, (B) remove such items, perform any work required to be performed by Tenant hereunder, and repair all damage caused by such work, and Tenant shall reimburse Landlord on demand for any expenses

25

which Landlord may incur in effecting compliance with Tenant's obligations hereunder (including collection costs and attorneys' fees), plus interest thereon at the Default Rate, or (C) elect any of the actions described in clauses (A) and (B) above as Landlord may elect in its sole discretion. The provisions of this Section 20 shall survive the end of the Term.

21. **Holding Over**. If Tenant fails to vacate the Premises at the end of the Term, then Tenant shall be a month-to-month tenant and, in addition to all other damages and remedies to which Landlord may be entitled for such holding over, (a) Tenant shall pay, in addition to the other Rent, Basic Rent equal to 125% of the Rent payable during the last month of the Term for the first thirty (30) days, 150% for the subsequent thirty (30) days and 200% thereafter, and (b) Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease. The provisions of this Section 21 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises within ninety (90) days following the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including any claims made by any succeeding tenant founded upon such failure to surrender, and any lost profits or other consequential damages to Landlord resulting therefrom.

22. **Certain Rights Reserved by Landlord**. Landlord shall have the following rights:

22.1 **Building Operations**. To decorate and to make inspections, repairs, alterations, additions, changes, or improvements, whether structural or otherwise, in and about the Building, or any part thereof; to enter upon the Premises (after giving Tenant reasonable notice thereof, which may be oral notice, except in cases of real or apparent emergency, in which case no notice shall be required) and, during the continuance of any such work, to (a) temporarily close doors, entryways, public space, and corridors in the Building, (b) to interrupt or temporarily suspend Building services and facilities, (c) to change the name of the Building, (d) and to change the arrangement and location of entrances or passageways, doors, and doorways, corridors, elevators, stairs, restrooms, or other public parts of the Building; however, such changes shall not materially interfere with Tenant's occupancy of the Premises. Notwithstanding the foregoing and except in the event of an emergency, entry by Landlord shall only be permitted provided that (i) such entry does not materially interfere with Tenant's business operations in the Premises (ii) no repair, alterations or improvements shall reduce the size of the Premises and (iii) Landlord shall be responsible for any and all injury or damage occasioned to Tenant and/or the Premises during such entry due to Landlord's negligence or willful act or that of Landlord's employees, agents, contractors and/or invitees

22.2 **Security**. To take such reasonable measures as Landlord deems advisable for the security of the Building and its occupants; evacuating the Building for cause, suspected cause, or for drill purposes; temporarily denying access to the Building; and closing the Building after normal business hours and on Sundays and Holidays, subject, however, to Tenant's right to enter when the Building is closed after normal business hours under such reasonable regulations as Landlord may prescribe from time to time, which may include, by way of example but not limitation, that persons entering or leaving the Building, whether or not during normal business hours, identify themselves to a security officer by registration or otherwise and that such persons establish their right to enter or leave the Building;

22.3 **Prospective Purchasers and Lenders**. Upon twenty-four (24) hours prior notice (which notice may be verbal) to Tenant, to enter the Premises during normal business hours to show the Premises to prospective purchasers or lenders (provided no Event of Default exists and Tenant is then occupying the Premises, Tenant shall have the opportunity to provide a representative of Tenant to accompany such entry); and

22.4 **Prospective Tenants**. At any time during the last twelve (12) months of the Term (or earlier if Tenant has notified Landlord in writing that it does not desire to renew the Term) upon reasonable prior notice (which notice may be verbal) to Tenant, or at any time following the occurrence of an Event of Default that remains uncured, to enter the Premises at all reasonable hours to show the Premises to prospective tenants (provided no Event of Default exists and Tenant is then occupying the Premises, Tenant shall have the opportunity to provide a representative of Tenant to accompany such entry).

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

In exercising the foregoing rights in this Section 22, Landlord shall minimize any interference with Tenant's occupancy of the Premises.

23.     **Substitution Space**.  Intentionally Deleted.

24.     **Miscellaneous**.

24.1     **Landlord Transfer**.  Landlord may transfer any portion of the Building and any of its rights under this Lease.  If Landlord assigns its rights under this Lease, then Landlord shall thereby be released from any further obligations hereunder arising after the date of transfer, provided that the assignee assumes in writing Landlord's obligations hereunder arising from and after the transfer date.

24.2     **Landlord's Liability**.  The liability of Landlord (and its successors, partners, shareholders or members) to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any matter relating to or arising out of the occupancy or use of the Premises and/or other areas of the Building or Building shall be limited to Tenant's actual direct, but not consequential, damages therefor and shall be recoverable only from the interest of Landlord in the Building, and Landlord (and its partners, shareholders or members) shall not be personally liable for any deficiency.  The provisions of this Section shall survive any expiration or termination of this Lease.

24.3     **Tenant's Liability**.  Except as otherwise expressly set forth in Section 21 of this Lease, the liability of Tenant to Landlord for any monetary damages arising from any default by Tenant under the terms of this Lease shall be limited to Landlord's actual direct, but not consequential, damages therefor.  Nothing in this Section 24.3 shall affect or limit Landlord's rights to file legal actions to recover possession of the Premises, or for injunctive relief against Tenant, or any other non-monetary relief as provided in Sections 18 of this Lease.

24.4     **Force Majeure**.  Other than for either party's obligations under this Lease that can be performed by the payment of money (e.g., payment of Rent or the Construction Allowance and maintenance of insurance), whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, terrorist acts or activities, governmental laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the control of such party ("**Force Majeure Delays**").  However, the provisions of this Section 24.4 shall not apply to Section 6.3 (Restoration of Services; Abatement) or Section 15 (Fire or Other Casualty).

24.5     **Brokerage**.  Neither Landlord nor Tenant has dealt with any broker or agent in connection with the negotiation or execution of this Lease, other than CBRE, Inc., Fischer & Company, and Cushman & Wakefield of Pennsylvania, Inc., whose commissions shall be paid by Landlord pursuant to separate written agreements.  Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, liens and other liability for commissions or other compensation claimed by any other broker or agent claiming the same by, through, or under the indemnifying party.

24.6     **Estoppel Certificates**.  From time to time (but not more than two (2) times in any calendar year), Tenant shall furnish to any party designated by Landlord, within fifteen (15) days after Landlord has made a request therefor, a certificate signed by Tenant confirming and containing such factual certifications and representations as to this Lease as Landlord may reasonably request.  Unless otherwise required by Landlord's Mortgagee or a prospective purchaser or mortgagee of the Building, the initial form of estoppel certificate to be signed by Tenant is attached hereto as Exhibit F; provided, however, such form may be amended or modified to the extent any of the certifications or representations contained therein are not true as of the date Tenant executes the same.  If Tenant does not deliver to Landlord the certificate signed by Tenant within such required time period, Landlord, Landlord's Mortgagee and any prospective purchaser or mortgagee, may conclusively presume and rely upon the following facts:  (1) this Lease is in full force and effect; (2) the terms and provisions of this Lease have not been changed except as otherwise represented by Landlord; (3) not more than one monthly installment of Basic Rent and other charges have been paid in advance; (4) there are no claims against Landlord nor any defenses or rights of offset against collection of Rent or other charges; and (5) Landlord is not in default under this Lease.

27                    MONTGOMERY CORPORATE CENTER
                                   200 DRYDEN ROAD
                                   DRESHER, PENNSYLVANIA

24.7   **Notices**.  All notices and other communications given pursuant to this Lease shall be in writing and shall be (1) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the parties hereto at the address specified in the Basic Lease Information, (2) hand-delivered to the intended addressee, (3) sent by a nationally recognized overnight courier service which requires proof of delivery, or (4) sent by facsimile transmission during normal business hours followed by a confirmatory letter sent in another manner permitted hereunder.  All notices shall be effective upon delivery (which, in the case of delivery by facsimile transmission, shall be deemed to occur at the time of delivery indicated on the electronic confirmation of the facsimile so long as the confirmatory letter referenced above is sent) to the address of the addressee (even if such addressee refuses delivery thereof) or refusal.  The parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

24.8   **Separability**.  If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby and in lieu of such clause or provision, there shall be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and be legal, valid, and enforceable.

24.9   **Amendments; Binding Effect; No Electronic Records**.  This Lease may not be amended except by instrument in writing signed by Landlord and Tenant.  No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord, and no custom or practice which may evolve between the parties in the administration of the terms hereof shall waive or diminish the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms hereof.  Landlord and Tenant hereby agree not to conduct the transactions or communications contemplated by this Lease by electronic means, except by facsimile transmission as specifically set forth in Section 24.7 or electronic signatures as specifically set forth in Section 24.10; nor shall the use of the phrase "in writing" or the word "written" be construed to include electronic communications except by facsimile transmissions as specifically set forth in Section 24.7 and other electronic signatures as specifically set forth in Section 24.10.  The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and upon their respective successors in interest and legal representatives, except as otherwise herein expressly provided.  This Lease is for the sole benefit of Landlord and Tenant, and, other than Landlord's Mortgagee, no third party shall be deemed a third party beneficiary hereof.

24.10   **Counterparts**.  This Lease (and amendments to this Lease) may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one document.  To facilitate execution of this Lease, the parties may execute and exchange, by telephone facsimile or electronic mail PDF, counterparts of the signature pages.  Signature pages may be detached from the counterparts and attached to a single copy of this Lease to physically form one document.

24.11   **Quiet Enjoyment**.  Provided Tenant has performed all of its obligations hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, but not otherwise, subject to the terms and conditions of this Lease and all matters of record as of the date of this Lease which are applicable to the Premises.

24.12   **No Merger**.  There shall be no merger of the leasehold estate hereby created with the fee estate in the Premises or any part thereof if the same person acquires or holds, directly or indirectly, this Lease or any interest in this Lease and the fee estate in the leasehold Premises or any interest in such fee estate.

24.13   **No Offer**.  The submission of this Lease to Tenant shall not be construed as an offer, and Tenant shall not have any rights under this Lease unless Landlord executes a copy of this Lease and delivers it to Tenant.

24.14   **Entire Agreement**.  This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto. Except for those set forth in this Lease, no representations, warranties, or agreements have been made by Landlord or Tenant to the other with respect to this Lease or the obligations of Landlord or Tenant in connection therewith. Except as otherwise provided herein, no subsequent alteration, amendment, change or addition to this Lease shall be

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

binding unless in writing and signed by Landlord and Tenant. The normal rule of construction that any ambiguities be resolved against the drafting party shall not apply to the interpretation of this Lease or any exhibits or amendments hereto

24.15   **Waiver of Jury Trial**.  THE GUARANTOR AND THE LANDLORD AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY THE LANDLORD OR THE GUARANTOR ON OR WITH RESPECT TO THIS GUARANTY OR THE LEASE SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. THE LANDLORD AND THE GUARANTOR EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, THE GUARANTOR AND LANDLORD WAIVE ANY RIGHT THE GUARANTOR AND LANDLORD MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE GUARANTOR AND LANDLORD ACKNOWLEDGE AND AGREE THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THE GUARANTY.

_____              _____
Landlord Initials                                      Guarantor Initials

24.16   **Governing Law**.  This Lease shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

24.17   **Recording**.  Tenant shall not record this Lease or any memorandum of this Lease without the prior written consent of Landlord, which consent may be withheld or denied in the sole and absolute discretion of Landlord, and any recordation by Tenant shall be a material breach of this Lease.  Tenant grants to Landlord a power of attorney to execute and record a release releasing any such recorded instrument of record that was recorded without the prior written consent of Landlord.

24.18   **Water or Mold Notification**.  To the extent Tenant or its agents or employees discover any water leakage, water damage or mold in or about the Premises or Building, Tenant shall promptly notify Landlord thereof in writing and Landlord shall promptly remediate and remove the same.

24.19   **Joint and Several Liability**.  If Tenant consists of more than one party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease.  All unperformed obligations of Tenant hereunder not fully performed at the end of the Term shall survive the end of the Term, including payment obligations with respect to Rent and all obligations concerning the condition and repair of the Premises.

24.20   **Financial Reports**.  Within fifteen (15) days after Landlord's request, Tenant will furnish Tenant's and Guarantor's most recent audited financial statements (including any notes to them) to Landlord, or, if no such audited statements have been prepared, such other financial statements (and notes to them) as may have been prepared by an independent certified public accountant or, failing those, Tenant's and Guarantor's internally prepared financial statements.  Landlord will not disclose any aspect of Tenant's or Guarantor's financial statements that Tenant designates to Landlord as confidential except (1) to Landlord's Mortgagee or prospective mortgagees or purchasers of the Building, (2) in litigation between Landlord and Tenant, and/or (3) if required by Law or court order.  Tenant shall not be required to deliver the financial statements required under this Section 24.20 more than once in any 12-month period unless requested by Landlord's Mortgagee or a prospective buyer or lender of the Building or an Event of Default occurs.

24.21   **Tenant Liability**.  In no event shall the officers, directors, agents, partners, principals, agents, employees and/or shareholders of Tenant have any liability whatsoever for any damages and/or liability under this Lease and the Landlord will look solely to the Tenant for the recovery of any damages or otherwise under any terms, covenants or conditions contained in this Lease.

24.22   **Landlord's Fees**.   Intentionally Deleted.

24.23   **Telecommunications**.   Tenant and its telecommunications companies, including local exchange telecommunications companies and alternative access vendor services companies, shall have no right of access to and within the Building, for the installation and operation of telecommunications systems, including voice, video, data, Internet, and any other services provided over wire, fiber optic, microwave, wireless, and any other transmission systems ("**Telecommunications Services**"), for part or all of Tenant's telecommunications within the Building and from the Building to any other location unless Landlord has previously reviewed and approved all plans, specifications and contracts pertaining to telecommunication service entry points, any documents to which Landlord is a party or which may encumber the Building, which consent will not be unreasonably withheld, conditioned or delayed.   All providers of Telecommunications Services shall be required to comply with the rules and regulations of the Building, applicable Laws and Landlord's policies and practices for the Building, and shall be required, at Landlord's election, to enter into a license agreement with Landlord to confirm and approve items such as, without limitation, the proposed location (and labeling requirements) of wiring, cabling, fiber lines, points of demarcation, entry into the Building, insurance requirements and the like.   Tenant acknowledges that Landlord shall not be required to provide or arrange for any Telecommunications Services and that Landlord shall have no liability to any Tenant Party in connection with the installation, operation or maintenance of Telecommunications Services or any equipment or facilities relating thereto.   Tenant, at its cost and for its own account, shall be solely responsible for obtaining all Telecommunications Services.

24.24   **Confidentiality**.   Both Landlord and Tenant acknowledge that the terms and conditions of this Lease (other than the existence of this Lease and the location of the Premises) are to remain confidential for both parties' benefit, and may not be disclosed by either party to anyone, by any manner or means, directly or indirectly, without the other party's prior written consent; however, Landlord or Tenant may disclose the terms and conditions of this Lease to its respective attorneys, accountants, employees and existing or prospective financial partners, assignees and/or sublessees and, as to Landlord, any potential purchasers, brokers or any other party assisting Landlord in the sale of the Building, or if required by Law or court order, provided all parties to whom Tenant is permitted hereunder to disclose such terms and conditions are advised by Landlord or Tenant (as the case may be) of the confidential nature of such terms and conditions and agree to maintain the confidentiality thereof (in each case, prior to disclosure).   The disclosing party shall be liable for any disclosures made in violation of this Section by the disclosing party or by any entity or individual to whom the terms of and conditions of this Lease were disclosed or made available by the disclosing party.   The consent by either party to any disclosures shall not be deemed to be a waiver on the part of such party of any prohibition against any future disclosure.   Notwithstanding anything to the contrary herein, Landlord and Tenant shall each have the right to make disclosures of the terms of this Lease (a) to the extent required by legal requirements, (b) to the extent reasonably required to enforce such party's rights hereunder, (c) to the extent reasonably necessary in connection with such party's financing, selling, leasing, subleasing or otherwise transferring or capitalizing its assets or its business (or any such transaction consummated by such party's affiliate) (including, without limitation, disclosures that are reasonably necessary to comply with rules of the Securities and Exchange Commission or any stock exchange), (d) to the extent reasonably required in connection with such party's books and records being audited, (e) to the extent reasonably required in constructing, operating, maintaining, repairing or restoring the Premises or the other portions of the Building, and (f) pursuant to a press release which has been approved by both parties.

24.25   **Authority**.   Tenant (if a corporation, partnership or other business entity) hereby represents and warrants to Landlord that Tenant is and will remain during the Term a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Tenant has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Tenant is authorized to do so.   Landlord hereby represents and warrants that Landlord is a duly formed and existing entity qualified to do business in the state in which the Premises are located, that Landlord has full right and authority to execute and deliver this Lease, and that each person signing on behalf of Landlord is authorized to do so.

24.26   **Hazardous Materials**.   The term "**Hazardous Materials**" means any substance, material, or waste (including asbestos-containing material) which is now or hereafter classified or considered to be hazardous, toxic, or dangerous under any Law relating to pollution or the protection or regulation of human health, natural resources or the environment, or poses or threatens to pose a hazard to the health or safety of persons on the

30

Premises or in the Building. No Tenant Party shall use, generate, store or Release (defined below), or permit the use, generation, storage or Release of Hazardous Materials on or about the Premises or the Building except in a manner and quantity necessary for the ordinary performance of Tenant's business, and then in compliance with all Laws and in a reasonable and prudent manner. As used herein, "**Release**" means depositing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing. If any Tenant Party breaches its obligations under this Section 24.25, Landlord may immediately take any and all action reasonably appropriate to remedy the same, including taking all appropriate action to clean up or remediate any contamination resulting from such Tenant Party's use, generation, storage or disposal of Hazardous Materials. Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from and against any and all claims, demands, liabilities, causes of action, suits, judgments, damages and expenses (including reasonable attorneys' fees and cost of clean up and remediation) arising from any Tenant Party's failure to comply with the provisions of this Section 24.25. The foregoing notwithstanding, in no event shall Tenant be liable to Landlord for any contamination due to Hazardous Materials in or about the Building that was not caused by a Tenant Party. This indemnity provision is intended to allocate responsibility between Landlord and Tenant under environmental Laws and shall survive termination or expiration of this Lease. Landlord represents and warrants to Tenant that to Landlord's knowledge, as of the date of this Lease, Landlord has not received written notice of any Hazardous Materials on the Land or within the Premises in violation of any applicable environmental Law. Landlord and Tenant each specifically acknowledge and agree that all references in this Lease to the phrase "to Landlord's knowledge" (or other similar phrase) (1) shall mean the actual (not constructive) personal knowledge of Mike Everly, Landlord's asset manager ("**Landlord's Personnel**"); (2) shall in no case mean or refer to the actual or constructive knowledge of any other employee, trustee, partner, agent or partner of a partner, officer, director or other representative of Landlord or any investment advisor, attorney, contractor or representative of Landlord (together with Landlord's Personnel, "**Landlord's Representatives**"); and (3) shall in no event or circumstance impose upon Landlord or any of Landlord's Representatives any duty or obligation to verify, inquire or make any independent inquiry or investigation of any such representation, warranty or statement, or to otherwise investigate the facts or circumstances relating or otherwise pertinent thereto. Tenant further acknowledges and agrees that none of Landlord's Representatives shall be personally liable, or otherwise have any personal liability, under or in connection with this Lease, including without limitation, in connection with any of the representations, warranties or statements made in connection with, or pursuant to, this Lease.

   24.27 **Generator**. Notwithstanding anything to the contrary contained in the Lease, and subject to the conditions listed below, Landlord hereby grants Tenant, at Tenant's sole cost and expense, (i) the exclusive right to use an existing 800 KW generator at the Building which is currently located behind the Building to the right of the loading dock as more particularly set forth on <u>Exhibit D</u> hereto ("**Current Generator**"). Tenant agrees to accept the Current Generator in its existing as-is, where-is condition, and with all faults and Landlord shall have no liability or obligation to make any repairs, maintenance, modifications or alterations with respect thereto. Tenant acknowledges that in no event shall Landlord have any obligations or liabilities with respect to the Current Generator and Landlord disclaims and Tenant waives any warranties with respect to the condition of such Current Generator. Tenant shall not make any additions or modifications to the Current Generator (other than routine repair and maintenance) without the prior written approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Tenant, at its sole cost and expense, shall install, maintain, repair and operate the Current Generator in good working condition and in a first class manner. Tenant shall use, operate, maintain and repair the Current Generator throughout the Term of the Lease in accordance with all applicable local, state and federal Laws, rules and regulations (including any environmental laws or rules or regulations of any applicable governmental authority). Tenant's installation and maintenance of the Current Generator shall be performed during the Building's non-business hours and in a reasonable manner so as not to unreasonably disturb other tenants located in the Building. No "rent" shall be charged for the Current Generator. The Current Generator shall be operated in a manner so as not to cause any unreasonable noise, odor or vibration or any other unreasonable disturbance which may materially and adversely interfere with the operations of other tenants in the Building. Tenant shall, at Tenant's sole cost and expense, screen the Current Generator from view in a manner reasonably acceptable to Landlord in its sole discretion. In the event that the Current Generator causes soil, oil, fumes or other debris to accumulate on the Building's brick or glass, Tenant shall immediately clean such debris at its sole cost and expense upon receipt of notice from Landlord, or, at Landlord's option, Landlord may clean the debris and Tenant shall reimburse Landlord within thirty (30) days of demand therefor for the reasonable costs of such cleaning. **Notwithstanding anything to the contrary in this Lease, Tenant hereby agrees to indemnify, protect, defend and hold harmless Landlord for, from and against all liabilities, claims, fines, penalties, costs, damages or injuries to persons, damages to**

31

property, losses, liens, causes of action, suits, judgments and expenses (including court costs, reasonable attorneys' fees and reasonable costs of investigation), of any nature, kind or description of any person or entity, directly or indirectly arising out of, caused by, or resulting from (in whole or part) (1) Tenant's installation of or use, occupancy or enjoyment of the Current Generator, (2) any activity, work or other things done, permitted or suffered by Tenant and its agents and employees with respect to the Current Generator, or (3) any damage to Tenant's property, or the property of Tenant's agents, employees, contractors, business invitees or licensees, except in each case, to the extent caused by the gross negligence or willful misconduct of Landlord. Upon the expiration or earlier termination of the Term, if Landlord so requests in writing at least one hundred twenty (120) days prior to such expiration or earlier termination of the Term, Tenant shall be obligated to disconnect and remove the Current Generator and all related or ancillary equipment, wiring, and the like located outside the boundaries of the Premises and restore such areas (including greenery and landscaping, if any) in or about the Building where any portion of the Current Generator and all related or ancillary equipment, wiring, and the like is installed to its condition existing as of the Lease Date, reasonable wear and tear and damage caused by fire or other casualty excepted, and to repair any damage covered by such disconnection and/or removal. The terms and provisions of this paragraph shall survive the termination or earlier expiration of the Lease.

        24.28    Guaranty.  AJCF Corp, as successor by merger to CGI JCF, Inc., formerly known as Crump Group, Inc. (the "**Guarantor**") shall guarantee the payment and performance of all indebtedness (including all rents and other sums of any kind payable by Tenant under the Lease) and obligations of any kind payable or performable by Tenant under the Lease pursuant to a guaranty in the form attached hereto as <u>Exhibit J</u> and made a part hereof for all purposes, which guaranty shall be executed and delivered by such Guarantor to Landlord on or before the Date of this Lease and as a condition to the effectiveness of this Lease.

        24.29    **List of Exhibits**.  All exhibits and attachments attached hereto are incorporated herein by this reference.

| | |
|---|---|
| Exhibit A-1 – | Outline of Premises |
| Exhibit A-2– | Phase I Reduction Premises |
| Exhibit A-3– | Phase II Reduction Premises |
| Exhibit A-4– | Phase III Reduction Premises |
| Exhibit B - | Description of the Land |
| Exhibit C - | Building Rules and Regulations |
| Exhibit D - | Current Generator Location |
| Exhibit E - | Intentionally Deleted |
| Exhibit F - | Form of Tenant Estoppel Certificate |
| Exhibit G - | Parking |
| Exhibit H - | Renewal Options |
| Exhibit I - | Right of First Refusal |
| Exhibit I-1 - | Offered Space |
| Exhibit J - | Lease Guaranty |

        24.29.1  **Prohibited Persons and Transactions**.  Tenant represents and warrants that neither Tenant nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents is, nor will they become, a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Assets Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not Transfer this Lease to, contract with or otherwise engage in any dealings or transactions or be otherwise associated with such persons or entities.

        24.30    **Signage**.

32

24.30.1 **Monument Signage**.  Provided that (x) Tenant is the Tenant originally named herein or a Permitted Transferee, (y) Tenant is leasing and actually occupies at least 100,000 square feet of rentable area in the Building, and (z) no Event of Default has occurred and is continuing, then, subject to the further terms of this Paragraph 25.28.1 and all applicable laws, ordinances, restrictions, rules and regulations, as well as all applicable covenants, restrictions or deed restrictions affecting the Project (collectively, the "**Applicable Rules and Restrictions**"), Tenant shall have the non-exclusive right throughout the Term to continue to keep and maintain its existing signage on the existing monument sign ("**Monument Sign**") at the Building.  The maintenance, repairs and removal of, and the procurement of any required approvals for, the Monument Sign shall be at Tenant's sole cost and expense.  The Monument Sign shall be in compliance with all Applicable Rules and Restrictions.  Prior to any alterations or changes to the Monument Sign, Tenant shall submit to Landlord, for Landlord's approval which shall not be unreasonably withheld, delayed or, except as expressly provided herein, conditioned, a detailed drawing indicating the size, layout, design, configuration, lettering and/or graphics and color of the proposed changes or alternations to the Monument Sign.  In the event Landlord approves the proposed changes or alterations to the Monument Sign, Landlord shall evidence such approval in writing.  Tenant shall install, repair, maintain, and remove the Monument Sign with contractors reasonably approved by Landlord.  Any such contractors shall satisfy Landlord's reasonable insurance and indemnification requirements prior to performing any work.  Tenant agrees that the installation, maintenance, repair and removal of the Monument Sign shall be at Tenant's sole risk.  Tenant agrees to maintain the Monument Sign in good condition and repair and, prior to the expiration of the Lease Term or the earlier termination of this Lease or Tenant's right of possession under this Lease, Tenant shall remove the Monument Sign at its sole cost and expense.  In the event Tenant fails to repair or remove the Monument Sign, Landlord shall have the right to repair or remove the Monument Sign, as the case may be, and Tenant shall reimburse Landlord on demand for all costs incurred by Landlord in connection therewith, and upon any such removal Landlord shall have the right to dispose of the same in any manner Landlord so desires without any liability to Tenant therefor. TENANT AGREES TO INDEMNIFY AND HOLD LANDLORD HARMLESS FROM AND AGAINST ANY AND ALL LIENS, CLAIMS, DEMANDS, LIABILITIES, AND EXPENSES (INCLUDING REASONABLE ATTORNEY'S FEES) INCURRED OR SUFFERED BY LANDLORD AND EXISTING OUT OF OR IN ANY WAY RELATED TO THE INSTALLATION, MAINTENANCE, REPAIR OR REMOVAL OF THE MONUMENT SIGN, UNLESS THE SAME IS CAUSED IN PART (BUT NOT SOLELY) BY THE NEGLIGENCE OF LANDLORD, ITS EMPLOYEES, AGENTS OR REPRESENTATIVES.  Notwithstanding anything herein to the contrary, Landlord shall have the right to terminate Tenant's rights under this Paragraph 24.30.1 by providing written notice of termination to Tenant if, at any time, Tenant (1) assigns this Lease other than to a Permitted Transferee, or (2) suffers an Event of Default of any term or condition of this Lease.  In the event Landlord terminates Tenant's rights under this Paragraph 24.30.1 as provided for in the immediately preceding sentence, Tenant shall remove the Monument Sign and repair any damage caused by the installation, maintenance and/or removal thereof within thirty (30) days following receipt of Landlord's written notice of termination, and, in the event Tenant fails to timely remove the Monument Sign and/or repair such damage, Landlord shall have the right to do the same and Tenant shall reimburse Landlord on demand for all costs incurred by Landlord in connection therewith (and Tenant shall be deemed to have abandoned the Monument Sign and Landlord shall have the right to dispose of the Monument Sign in any manner Landlord shall choose in its sole discretion without any liability whatsoever to Tenant with respect thereto).

24.30.2 **Building Signage**.  Provided that (x) Tenant is the Tenant originally named herein or a Permitted Transferee, (y) Tenant is leasing and actually occupies at least 100,000 square feet of rentable area in the Building, and (z) no Event of Default has occurred and is continuing, then, subject to availability as reasonably determined by Landlord, and subject to the further terms of this Paragraph 24.30.2 and all Applicable Rules and Restrictions, Tenant shall have the non-exclusive right throughout the Term to install one (1) sign on the fascia of the Building ("**Fascia Sign**") provided that Landlord, acting reasonably, approves the Fascia Sign (including the size and type and all structural engineering and aesthetic aspects thereof) and the exact location where the same is to be installed.  The engineering, manufacture, installation, maintenance and removal of, and the procurement of all required approvals for, the Fascia Sign shall be at Tenant's sole cost and expense.  The installation of the Fascia Sign shall be in compliance with all Applicable Rules and Restrictions.  Prior to the manufacturing or installing the Fascia Sign, Tenant shall submit to Landlord, for Landlord's approval which shall not be unreasonably withheld,

delayed or, except as expressly provided herein, conditioned, (i) a report from a structural engineer reasonably acceptable to Landlord providing that (A) the Building can adequately support the installation of the Fascia Sign, and (B) the Fascia Sign can and will be installed in a manner that will not damage, or otherwise adversely affect or diminish the structural integrity or outer structure of, the Building, and (ii) a detailed drawing indicating the size, layout, design, configuration, lettering and/or graphics and color of the proposed Fascia Sign, together with the proposed location where the Fascia Sign is to be installed.  In the event Landlord approves the structural report, the Fascia Sign and the location, Landlord shall evidence such approval in writing.   Tenant shall install, repair, maintain, and remove the Fascia Sign with contractors reasonably approved by Landlord.  Any such contractors shall satisfy Landlord's insurance and indemnification requirements prior to performing any work.   Tenant agrees that the installation, maintenance, repair and removal of the Fascia Sign shall be at Tenant's sole risk.   Tenant agrees to maintain the Fascia Sign in good condition and repair and, prior to the expiration of the Lease Term or the earlier termination of this Lease or Tenant's right of possession under this Lease, Tenant shall remove the Fascia Sign at its sole cost and expense.  In the event Tenant fails to repair or remove the Fascia Sign, Landlord shall have the right to repair or remove the Fascia Sign, as the case may be, and Tenant shall reimburse Landlord on demand for all costs incurred by Landlord in connection therewith, and upon any such removal Landlord shall have the right to dispose of the same in any manner Landlord so desires without any liability to Tenant therefor. TENANT AGREES TO INDEMNIFY AND HOLD LANDLORD HARMLESS FROM AND AGAINST ANY AND ALL LIENS, CLAIMS, DEMANDS, LIABILITIES, AND EXPENSES (INCLUDING REASONABLE ATTORNEY'S FEES) INCURRED OR SUFFERED BY LANDLORD AND EXISTING OUT OF OR IN ANY WAY RELATED TO THE INSTALLATION, MAINTENANCE, REPAIR OR REMOVAL OF THE FASCIA SIGN, UNLESS THE SAME IS CAUSED IN PART (BUT NOT SOLELY) BY THE NEGLIGENCE OF LANDLORD, ITS EMPLOYEES, AGENTS OR REPRESENTATIVES.  Notwithstanding anything herein to the contrary, Landlord shall have the right to terminate Tenant's rights under this <u>Paragraph 24.30.2</u> by providing written notice of termination to Tenant if, at any time, Tenant (1) assigns this Lease other than to a Permitted Transferee, or (2) suffers an event of default of any term or condition of this Lease.  In the event Landlord terminates Tenant's rights under this <u>Paragraph 24.30.2</u> as provided for in the immediately preceding sentence, Tenant shall remove the Fascia Sign from the Building and repair any damage to the Building caused by the installation, maintenance and/or removal thereof within thirty (30) days following receipt of Landlord's written notice of termination, and, in the event Tenant fails to timely remove the Fascia Sign and/or repair such damage, Landlord shall have the right to do the same and Tenant shall reimburse Landlord on demand for all costs incurred by Landlord in connection therewith (and Tenant shall be deemed to have abandoned the Fascia Sign and Landlord shall have the right to dispose of the Fascia Sign in any manner Landlord shall choose in its sole discretion without any liability whatsoever to Tenant with respect thereto).

      24.31   **Satellite Dish**.   Landlord hereby covenants and agrees that Landlord shall not unreasonably withhold, delay or condition its consent to a proposal by Tenant to install, maintain and replace from time to time one (1) satellite dish or similar antennae device, in a location designated by Landlord, the height and width of such device to be reasonably acceptable to Landlord (but not to exceed a 3 meter satellite dish) (hereinafter, the "**Satellite Dish**") on the roof of the Building, subject to the following: (a) applicable governmental laws; (b) the right of Landlord to supervise any roof penetrations; (c) Landlord's approval of the plans and specifications for the Satellite Dish and all connecting cables from the roof of the Building to the Premises; (d) compliance with the conditions of any roof bond maintained by Landlord on the Premises; (e) the Satellite Dish not being visible at street level, and (f) the Satellite Dish not interfering with any then existing satellite dish or other antenna on the roof of the Building.   Tenant shall be responsible for the repair of any damage to any portion of the Building caused by Tenant's installation, use or removal of the Satellite Dish.  The Satellite Dish shall remain the exclusive property of Tenant, and Tenant shall have the right to remove same at any time during the term of the Lease so long as Tenant is not in default under the Lease.  Except to the extent caused by the negligence or willful misconduct of Landlord, Tenant shall protect, defend, indemnify and hold harmless Landlord from and against any and all claims, damages, liabilities, costs or expenses of every kind and nature (including without limitation reasonable attorney's fees) imposed upon or incurred by or asserted against Landlord arising out of Tenant's installation, maintenance, use or removal of the Satellite Dish.

34

25.      **Other Provisions**.

25.1      **Security System**.  Tenant may, at its sole cost and expense, install an electronic card key system within the Premises.  Tenant shall furnish Landlord with a copy of all key codes or access cards and Tenant shall provide Landlord with the ability to access the Premises at all times subject to the limits and requirements of this Lease.  Additionally, Tenant's system shall comply with all Laws, including all fire safety laws, and in no event shall Landlord be liable for, and Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from any claims, demands, liabilities, causes of action, suits, judgments, damages and expenses arising from, such system or the malfunctioning thereof.  Sections 7 and 20 of this Lease shall govern the installation, maintenance and Landlord's removal rights with respect to such security system.

25.2      **Landlord's Default**.

25.2.1      **General Provisions**.  Except as provided below in this Section 25.2.1, and except where the provisions of this Lease grant Tenant an express, exclusive remedy, or expressly deny Tenant a remedy, Tenant's sole and exclusive remedy for Landlord's failure to perform its obligations under this Lease following the Commencement Date shall be limited to damages, injunctive relief, or specific performance; in each case, Landlord's liability or obligations with respect to any such remedy shall be limited as provided in Section 24.2.  Landlord shall be in default under this Lease if Landlord fails to perform any of its obligations hereunder following the Commencement Date and such failure continues for thirty (30) days after Tenant delivers to Landlord written notice specifying such failure; however, if such failure cannot reasonably be cured within such 30-day period, but Landlord commences to cure such failure within such 30-day period and thereafter diligently pursues the curing thereof to completion, then Landlord shall not be in default hereunder or liable for damages therefor.  Notwithstanding the foregoing, if Landlord fails to commence to make any repair to the Premises required to be made by Landlord under this Lease within thirty (30) days after receipt by Landlord from Tenant of written notice of the need for such repair and/or fails to diligently pursue the completion of such repair and/or fails to complete such repairs within a reasonable time, and Landlord does not dispute in good faith that Landlord is obligated pursuant to the terms of this Lease to perform the obligation in question, Tenant shall have the right to cure such default after giving an additional written notice (the "**Second Notice**") to Landlord.  If such default remains uncured for an additional ten (10) business days after Landlord's receipt of the Second Notice, and such failure by Landlord materially and adversely affects Tenant's use or occupancy of the Premises, then Tenant may perform such obligation in good and workmanlike manner and compliance with all Laws and this Lease.  Thereafter Landlord shall pay to Tenant the reasonable out-of-pocket costs actually incurred by Tenant to cure such default within thirty (30) days following receipt by Landlord of the paid invoices therefor.  If Landlord fails to pay such costs to Tenant within such 30-day period, Tenant may offset such costs that are not in good faith disputed by Landlord against Tenant's next accruing installments of Basic Rent until Tenant has been reimbursed for such costs; provided, however, that the amount offset against Basic Rent in any single month shall not exceed twenty percent (20%) of the Basic Rent payable for such month.  Notwithstanding anything herein to the contrary, Tenant shall have no right of self-help with respect to any portion of the Building outside the Premises or any component of the Building's Structure or the Building's Systems, including the heating, air conditioning and ventilating, mechanical, electrical and plumbing systems, controlled access system, sprinkler system and fire/life safety system.

25.2.2      Intentionally Deleted.

*[Signature page follows]*

35

Wherefore, Landlord and Tenant have respectively executed this Lease the day and year first above written.

**LANDLORD:**                                    **TENANT:**

MONTGOMERY CORPORATE CENTER, INC.,      ASCENSUS, INC.,
a California corporation                         a Delaware corporation

By: _____            By: _____
Name: _____            Name: Robert Guillocheau
Title: _____            Title: President

MONTGOMERY CORPORATE CENTER
                                                         200 DRYDEN ROAD
                                                      DRESHER, PENNSYLVANIA

**EXHIBIT A-1**

**OUTLINE OF PREMISES**



| | CURRENT ASCENSUS SPACE |
| | COMMON SPACE |



A-1

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA



CURRENT ASCENSUS SPACE



d2 solutions inc.
interior design & planning
2540 Renaissance Boulevard, Ste. 100
King of Prussia, PA 19406
610-738-0390 p   610-738-0299 f

Project Name:

ASCENSUS PHASED
GIVE-BACK
200 DRYDEN ROAD
DRESHER, PA 19025

Drawn By:  GD

Approved By:  TP

Issue Date: 01/25/13

| No. | Date: | Revi |
|-----|-------|------|
| 0 | 1/25/13 | ISSUED |
| | | |
| | | |
| | | |
| | | |

Scale:  1/64" = 1'-0"

Drawing:

**2ND FLOOR PLAN
CURRENT
ASCENSUS
SPACE**

**EXHIBIT E**

A-2

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA





d2 solutions inc.
interior design & planning

2540 Renaissance Boulevard, Ste. 100
King of Prussia, PA 19406

610-230-0700 P 610-230-0700 F

Project Name:

ASCENSUS PHASED
GIVE-BACK
200 DRYDEN ROAD
DRESHER, PA 19025

| Drawn By: | GD |
| Approved By: | TP |
| Issue Date: | 01/25/13 |

| No. | Date: | Rev: |
|---|---|---|
| 0 | 1/25/13 | ISSUED |
| | | |
| | | |
| | | |
| | | |

Scale: 1/64" = 1'-0"

Drawing:
4TH FLOOR PLAN
CURRENT
ASCENSUS
SPACE

EXHIBIT F

CURRENT ASCENSUS SPACE

A-3

**EXHIBIT A-2**

**PHASE I REDUCTION PREMISES**



A-4

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

## EXHIBIT A-3

## PHASE II REDUCTION PREMISES



PHASE II
GIVE BACK SPACE

A-5

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

**EXHIBIT A-4**

**PHASE III REDUCTION PREMISES**



A-6

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

**EXHIBIT B**

**DESCRIPTION OF THE LAND**

# LEGAL DESCRIPTION

**ALL THAT CERTAIN** piece or parcel of ground with the buildings and improvements thereon erected:

**BEGINNING** at a point, said point being a common corner between Block 12, Lots 2 and 3 at its intersection with the westerly sideline of Welsh Road and running thence;

1) THENCE, along the westerly sideline of Welsh Road the following eight (8) courses, South 53 degrees, 45 minutes 58 seconds East a distance of 203.56 feet to a concrete monument to be set,

2) THENCE, North 36 degrees 14 minutes 02 seconds East a distance of 16.70 feet to a concrete monument to be set,

3) THENCE, South 53 degrees 42 minutes 02 seconds East a distance of 240.00 feet to a concrete monument to be set,

4) THENCE, North 36 degrees 17 minutes 58 seconds East a distance of 5.00 feet to a concrete monument to be set,

5) THENCE, South 53 degrees 42 minutes 02 seconds East a distance of 250.00 feet to a concrete monument to be set,

6) THENCE, South 36 degrees 17 minutes 58 seconds West a distance of 10.00 feet to a concrete monument to be set,

7) THENCE, South 53 degrees 42 minutes 02 seconds East a distance of 116.16 feet to a point

8) THENCE, South 54 degrees 16 minutes 02 seconds East a distance of 301.24 feet to a point

9) THENCE, along a common line between Block 12, Lots 2 and 1 the following ten (10) courses, South 36 degrees 45 minutes 47 seconds West a distance of 428.42 feet to a point

10) THENCE, North 38 degrees 57 minutes 41 seconds West a distance of 133.37 feet to a point of curvature

11) THENCE, on curve to the left, having a radius of 250.00 feet, a length of 327.87 feet and whose chord bears North 76 degrees 31 minutes 58 seconds West a distance of 304.87 feet to a point of tangency

12) THENCE, South 65 degrees 53 minutes 45 seconds West a distance of 173.38 feet to point of curvature

13) THENCE, on a curve to the left, having a radius of 150.00 feet, a length of 108.75 feet and whose chord bears South 45 degrees 07 minutes 33 seconds West a distance of 106.39 feet to a point of tangency

14) THENCE, South 24 degrees 21 minutes 20 seconds West a distance of 229.17 feet to a point of curvature

15) THENCE, on a curve to the right, having a radius of 300.00 feet, a length of 215.35 feet and whose chord bears South 44 degrees 55 minutes 12 seconds West a distance of 210.76 feet to a point of tangency

16) THENCE, South 65 degrees 29 minutes 05 seconds West a distance of 188.68 feet to a point

17) THENCE, on a curve to the right, having a radius of 450.00 feet, a length of 159.90 feet and whose chord bears of South 17 degrees 52 minutes 00 seconds West a distance of 159.06 feet to a point

18) THENCE, on a curve to the left, having a radius of 432.00 feet, a length of 236.14 feet and whose chord bears South 74 degrees 34 minutes 23 seconds West a distance of 233.21 feet, to a point

19) THENCE, along a common line between Block 12, Lots 2 and 5, North 29 degrees 16 minutes 23 seconds West a distance of 384.06 feet to a point

B-1

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

20) THENCE, along a common line between Block 12, Lots 2 and 4 at first then Lot 3, as it follow the approximate centerline of Prudential Road (private), on a curve to the left, having a radius of 650.00 feet, a length of 329.70 feet and whose chord bears North 26 degrees 41 minutes 07 seconds East a distance of 326.18 feet to a point of reverse curvature

21) THENCE, along a common line between Block 12, Lots 2 and 3, as it follow the approximate centerline of Prudential Road (private), on a curve to the right having a radius of 1,200.00 feet, a length of 515.41 feet and whose chord bears North 24 degrees 27 minutes 31 seconds East a distance of 511.46 feet to a point of tangency

22) THENCE, North 36 degrees 45 minutes 47 seconds East a distance of 646.29 feet to the point and place of BEGINNING.

CONTAINING an area of 25.284 acres or 1,101,352, square feet, more or less.

BEING the same Block 12, Lot 2 as shown on a plan entitled "Record Plan A, Sheet 1 of 3 and Record Plan B, Sheet 2 of 3, The Prudential Insurance Company of America Eastern Home Office, Upper Dublin Township Montgomery County, Pennsylvania" as prepared by Paulus, Sokolowski and Sartor Consulting Engineers, dated December 18, 1998 and revised through January 26, 2001.

SUBJECT to any easement or restrictions.

BEING THE SAME PREMISES which THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey Corporation by Memorandum of Ground Lease bearing the date of May 11, 2001 and recorded in the Office of the Recorder of Deeds, in and for the County of Montgomery AT NORRISTOWN, COMMONWEALTH OF PENNSYLVANIA on May 25, 2001 in Book 5361 Page 1488 granted and conveyed unto FORT WASHINGTON PHASE II, ASSOCIATES, L.P., a Delaware Limited Partnership, in fee.

B-2

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

**EXHIBIT C**

**BUILDING RULES AND REGULATIONS**

The following rules and regulations shall apply to the Premises, the Building, any parking garage or other parking lot or facility associated therewith, and the appurtenances thereto:

1.      Sidewalks, doorways, vestibules, halls, stairways, and other similar areas shall not be obstructed by tenants or used by any tenant for purposes other than ingress and egress to and from their respective leased premises and for going from one to another part of the Building. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and Landlord shall, in all cases, retain the right to control and prevent access thereto by all persons whose presence in the judgment of Landlord, reasonably exercised, shall be prejudicial to the safety, character, reputation and interests of the Building. No Tenant Party shall go upon the roof of the Building.

2.      Plumbing, fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or deposited therein. Damage resulting to any such fixtures or appliances from misuse by a tenant or its agents, employees or invitees, shall be paid by such tenant.

3.      No signs, advertisements or notices (other than those that are not visible outside the Premises) shall be painted or affixed on or to any windows or doors or other part of the Building without the prior written consent of Landlord. No nails, hooks or screws (other than those which are necessary to hang paintings, prints, pictures, or other similar items on the Premises' interior walls) shall be driven or inserted in any part of the Building except by Building maintenance personnel. No curtains or other window treatments shall be placed between the glass and the Building standard window treatments.

4.      Landlord shall provide all door locks at the entry of each tenant's leased premises, at the cost of such tenant, and no tenant shall place any additional door locks in its leased premises without Landlord's prior written consent. Landlord shall furnish to each tenant a reasonable number of keys to such tenant's leased premises, at such tenant's cost, and no tenant shall make a duplicate thereof. Replacement keys shall be provided on a reasonable basis and at Tenant's cost.

5.      Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by tenants of any bulky material, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be conducted under Landlord's supervision at such times and in such a manner as Landlord may reasonably require. Each tenant assumes all risks of and shall be liable for all damage to articles moved and injury to persons or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord if damaged or injured as a result of acts in connection with carrying out this service for such tenant.

6.      Landlord may prescribe weight limitations and determine the locations for safes and other heavy equipment or items, which shall in all cases be placed in the Building so as to distribute weight in a manner acceptable to Landlord which may include the use of such supporting devices as Landlord may require. All damages to the Building caused by the installation or removal of any property of a tenant, or done by a tenant's property while in the Building, shall be repaired at the expense of such tenant.

7.      Corridor doors, when not in use, shall be kept closed. Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No bicycles, birds or animals (other than seeing-eye dogs) shall be brought into or kept in, on or about any tenant's leased premises. No portion of any tenant's leased premises shall at any time be used or occupied as sleeping or lodging quarters.

8.      Tenant shall cooperate with Landlord's employees in keeping its leased premises neat and clean. Tenants shall not employ any person for the purpose of such cleaning other than the Building's cleaning and maintenance personnel.

C-1

MONTGOMERY CORPORATE CENTER<br>200 DRYDEN ROAD<br>DRESHER, PENNSYLVANIA

9.      To ensure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to any leased area except by persons approved by Landlord.

10.     Tenant shall not make or permit any vibration or improper, objectionable or unpleasant noises or odors in the Building or otherwise interfere in any way with other tenants or persons having business with them.

11.     No machinery or appliances of any kind (other than normal office equipment and normal break room appliances) shall be operated by any tenant on its leased area without Landlord's prior written consent, nor shall any tenant use or keep in the Building any flammable or explosive fluid or substance (other than typical office supplies [e.g., photocopier toner] used in compliance with all Laws).

12.     Landlord will not be responsible for lost or stolen personal property, money or jewelry from tenant's leased premises or public or common areas regardless of whether such loss occurs when the area is locked against entry or not.

13.     Except for use by Tenant's employees and visitors, no vending or dispensing machines of any kind may be maintained in any leased premises without the prior written permission of Landlord.

14.     Tenant shall not knowingly conduct any activity on or about the Premises or Building which will draw pickets, demonstrators, or the like.

15.     All vehicles are to be currently licensed, in good operating condition, parked for business purposes having to do with Tenant's business operated in the Premises, parked within designated parking spaces, one vehicle to each space. No vehicle shall be parked as a "billboard" vehicle in the parking lot. Any vehicle parked improperly may be towed away. Tenant, Tenant's agents, employees, vendors and customers who do not operate or park their vehicles as required shall subject the vehicle to being towed at the expense of the owner or driver. Landlord may place a "boot" on the vehicle to immobilize it and may levy a charge of $50.00 to remove the "boot."

16.     No tenant may enter into phone rooms, electrical rooms, mechanical rooms, or other service areas of the Building unless accompanied by Landlord or the Building manager.

17.     Tenant will not authorize any Tenant Party to bring onto the Building any handgun, firearm or other weapons of any kind, illegal drugs or, unless expressly permitted by Landlord in writing, alcoholic beverages.

18.     Tenant shall not authorize its employees, invitees or guests to smoke in the Premises or the lobbies, balconies, passages, corridors, elevators, vending rooms, rest rooms, stairways or any other area shared in common with other tenants in the Building, or authorize its employees, invitees, or guests to loiter at the Building entrances or balconies for the purposes of smoking. Landlord may, but shall not be required to, designate an area for smoking outside the Building.

19.     Tenant shall not allow any Tenant Party to use any type of portable space heater in the Premises or the Building.

20.     Only artificial holiday decorations may be placed in the Premises, no live or cut trees or other real holiday greenery may be maintained in the Premises or the Building.

21.     Tenant shall not park or operate any semi-trucks or semi-trailers in the parking areas associated with the Building.

22.     Tenant shall cooperate fully with Landlord to assure the most effective operation of the Premises or the Building's heating and air conditioning, and shall refrain from attempting to adjust any controls, other than room thermostats installed for Tenant's use. Tenant shall keep corridor doors closed and shall turn off all lights before leaving the Building at the end of the day.

C-2

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

23.    Without the prior written consent of Landlord, Tenant shall not use the name of the Building or any picture of the Building in connection with, or in promoting or advertising the business of, Tenant, except Tenant may use the address of the Building as the address of its business.

24.    Tenant shall not exhibit, sell or offer for sale, rent or exchange in the Premises or at the Building any article, thing or service to the general public or anyone other than Tenant's employees without the prior written consent of Landlord.

25.    In the event of any inconsistencies between the Lease and these Building Rules and Regulations, the Lease shall control.

C-3

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

**EXHIBIT D**

**CURRENT GENERATOR LOCATION**



D-1

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

**EXHIBIT E**

**INTENTIONALLY DELETED**

E-1

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

**EXHIBIT F**

**FORM OF TENANT ESTOPPEL CERTIFICATE**

_____
_____
_____
_____
_____

Re:     Lease Agreement (the "**Lease**") dated _____, of _____ square feet of space known as Suite No. _____, in the office building commonly known as _____, located at _____ ("**Premises**"), between _____, a _____ ("**Landlord**"), as Landlord, and _____, a _____ ("**Tenant**"), as Tenant. _[INCLUDE ANY MODIFICATIONS OR AMENDMENTS]_

Ladies and Gentlemen:

        Tenant hereby certifies to _____ ("**Lender**") and Landlord as follows:

        1.      The term of the Lease commenced on _____, and will expire on _____.

        2.      The Lease as described above constitutes the entire agreement of Landlord and Tenant with respect to the Premises, is true, correct and complete, has not been modified or amended except as described above, and is in good standing and in full force and effect.

        3.      Tenant has commenced payment of monthly fixed rent under the Lease in the amount of $_____, and such rent has been paid for the period ending on _____.

        4.      Tenant has paid a security deposit under the Lease in the amount of $_____.

        5.      Under the Lease, Tenant is required to pay as additional rent Tenant's proportionate share of electricity as well as Tenant's Proportionate Share of Excess Operating Costs.  All monthly installments of such estimated additional rent have been paid when due through _____.

        6.      To Tenant's knowledge, there are no defaults of Landlord under the Lease and there are no existing circumstances which with the passage of time, or notice, or both, would give rise to a default under the Lease.

        7.      Construction of all tenant improvements required under the Lease has been satisfactorily completed and Tenant has accepted and is occupying the Premises, and all reimbursements and allowances due to Tenant under the Lease in connection with any tenant improvement work have been paid in full.

        8.      Except as permitted by the Lease, Tenant has not generated, stored, handled or otherwise dealt with any hazardous or toxic waste, substance or material, or contaminants, oil, pesticides, radioactive or other materials on the Premises, the removal of which is required or the maintenance of which is prohibited, regulated or penalized by any local, state or federal agency, authority or governmental unit, nor will it do so in the future.

        9.      Tenant currently has no charge, lien, claim of set-off or defense against rents or other charges due or to become due under the Lease or otherwise under any of the terms, conditions, or covenants contained therein.

        10.     Tenant has not received any concession (rental or otherwise) in connection with renting the Premises except as expressly set forth in the Lease.

F-1

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

11.     To Tenant's knowledge, Tenant has received no notice from any insurance company of any defects or inadequacies in the Premises, or any part thereof, which would adversely affect the insurability of the Premises.

12.     To Tenant's knowledge, there are no pending suits, proceedings, judgments, bankruptcies, liens or executions against Tenant or any guarantor under the Lease which would interfere with Tenant's obligations under this Lease.

13.     Tenant does not have any rights or options to purchase the building in which the Premises are located.

14.     Tenant does not have any rights or options to renew the Lease or to lease additional space in any building owned by the Landlord except as expressly set forth in the Lease.

15.     To Tenant's knowledge, there has been no assignment by Landlord of its interest in the Lease other than to Lender.

16.     From and after the date hereof, so long as there shall be any assignment of the Lease to Lender or any successor thereto, Tenant will not pay any rent under the Lease more than thirty (30) days in advance of its due date.

17.     If Tenant is a corporation, partnership or other business entity, each individual executing this Estoppel Certificate on behalf of Tenant hereby represents and warrants that Tenant is and will remain during the Term a duly formed and existing entity qualified to do business in the state in which the Premises are located and that Tenant has full right and authority to execute and deliver this Estoppel Certificate and that each person signing on behalf of Tenant is authorized to do so.

18.     Tenant acknowledges that this Estoppel Certificate may be delivered to Landlord, Landlord's mortgagee, Lender or to a prospective mortgagee or prospective purchaser, and their respective successors and assigns, and acknowledges that Landlord, Lender and/or such prospective mortgagee or prospective purchaser will be relying upon the statements contained herein in disbursing loan advances or making a new loan or acquiring the property of which the Premises are a part and that receipt by it of this certificate is a condition of disbursing loan advances or making such loan or acquiring such property.

19.     For purposes of this Estoppel Certificate, the phrase "to Tenant's knowledge" means the present, actual (as opposed to constructive or imputed) knowledge of the employee, agent or officer of Tenant having the most actual knowledge of the respective subject matters.

20.     Executed as of _____, 20__.

**TENANT:**                                      _____, a _____

By: _____

Name: _____

Title: _____

F-2

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

**EXHIBIT G**

**PARKING**

Tenant is currently provided a total of nine hundred forty-five (945) parking spaces ("**Parking Spaces**") allocated as follows: (i) eight hundred sixty-two (862) of such parking spaces being unreserved parking spaces in common with other tenants at the Building, and (ii) eighty-three (83) of such parking spaces being reserved parking spaces. Once Tenant surrenders the Phase I Reduction Premises in accordance with the conditions of Section 1.1 of this Lease, then the parties agree that from and after either the Phase I Reduction Date (to the extent the Phase I Reduction Conditions have been satisfied) or June 30, 2017, as applicable based on the terms of Section 1.1 of this Lease, the total number of parking spaces shall be reduced by a total number of one hundred twelve (112) parking spaces, of which one hundred and two (102) shall be unreserved parking spaces and ten (10) shall be reserved parking spaces. Once Tenant surrenders the Phase II Reduction Premises in accordance with the conditions of Section 1.2 of this Lease, then the parties agree that from and after the Phase II Reduction Date the total number of parking spaces shall be reduced by a total number of forty-five (45) parking spaces, of which forty-one (41) shall be unreserved parking spaces and four (4) shall be reserved parking spaces. Once Tenant surrenders the Phase III Reduction Premises in accordance with the conditions of Section 1.3 of this Lease, then the parties agree that from and after June 30, 2017 the total number of parking spaces shall be reduced by a total number of forty-five (45) parking spaces, of which forty-one (41) shall be unreserved parking spaces and four (4) shall be reserved parking spaces. Tenant's use of the Parking Spaces shall be subject to such terms, conditions and regulations as are from time to time applicable to patrons of the parking area. There shall be no charge to Tenant for the use of the Parking Spaces.

Tenant shall at all times comply with all Laws respecting the use of the Parking Spaces. Landlord reserves the right to adopt, modify, and enforce reasonable rules and regulations governing the use of the Parking Spaces from time to time including designation of assigned parking spaces, requiring use of any key-card, sticker, or other identification or entrance systems and charging a fee for replacement of any such key-card sticker or other item used in connection with any such system and hours of operations. Landlord may refuse to permit any person who violates such rules and regulations to park in the Parking Spaces, and any violation of the rules and regulations shall subject the car to removal from the Parking Spaces.

Tenant may validate visitor parking by such method or methods as Landlord may approve, at the validation rate from time to time generally applicable to visitor parking. The unreserved parking spaces provided hereunder shall be provided on an unreserved basis. Tenant acknowledges that Landlord has arranged or may arrange for the Parking Spaces to be operated by an independent contractor, not affiliated with Landlord.

All motor vehicles (including all contents thereof) shall be parked in the Parking Area at the sole risk of Tenant and each other Tenant Party, it being expressly agreed and understood Landlord has no duty to insure any of said motor vehicles (including the contents thereof), and Landlord is not responsible for the protection and security of such vehicles. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE, LANDLORD SHALL HAVE NO LIABILITY WHATSOEVER FOR ANY PROPERTY DAMAGE OR LOSS WHICH MIGHT OCCUR ON THE PARKING SPACES OR AS A RESULT OF OR IN CONNECTION WITH THE PARKING OF MOTOR VEHICLES IN ANY OF THE PARKING SPACES.** Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties.

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47

**EXHIBIT H**

**RENEWAL OPTIONS**

1.      Tenant may renew this Lease for two (2) additional periods of five (5) years each, by delivering written notice of the exercise thereof (a "**Renewal Notice**") to Landlord not earlier than fifteen (15) months nor later than nine (9) months before the expiration of the then-current Term. The Basic Rent payable for each month during such extended Term shall be the Prevailing Rental Rate (defined below), at the commencement of such extended Term. As used herein, the "**Prevailing Rental Rate**" shall mean the prevailing rental rate that a willing tenant would pay, and a willing landlord would accept (both having reasonable knowledge of the relevant factors), for a renewal of a lease of space that is of equivalent quality, size, utility and location as the space in question and that is located in a comparable building (including the Building) within the Fort Washington-Horsham submarket of Pennsylvania, taking into consideration (a) the location, quality and age of the Building; (b) the use and size of the space in question; (c) the location and/or floor level of the space in question; (d) the amount of any tenant improvement allowances, abatement of rental, or other tenant inducements for the space in question, if any; (e) the fact that a lease may be a "triple net", "base year", "expense stop" or "gross" lease for the space in question; (f) the amount of any brokerage commissions; (g) the expense stop or base year for pass-through expense purposes for the space in question; (h) the credit standing of Tenant; (i) the length of the term for the space in question; and (j) the amount of any parking charges of equivalent quality, size, utility and location. Within thirty (30) days after receipt of Tenant's Renewal Notice, Landlord shall deliver to Tenant written notice of the Prevailing Rental Rate and shall advise Tenant of the required adjustment to Basic Rent, if any, and the other terms and conditions offered. Tenant shall, within ten (10) days after receipt of Landlord's notice, provide written notification to Landlord as to whether Tenant accepts or rejects Landlord's determination of the Prevailing Rental Rate.

2.      If Tenant timely notifies Landlord that Tenant accepts Landlord's determination of the Prevailing Rental Rate, then, on or before the commencement date of the extended Term, Landlord and Tenant shall execute an amendment to this Lease extending the Term on the same terms and conditions provided in this Lease, except as follows:

      (a)      Basic Rent shall be adjusted to the Prevailing Rental Rate and the Base Year shall be adjusted to the calendar year in which such renewal option shall commence;

      (b)      except for any unexercised renewal options remaining under this Exhibit, Tenant shall have no further renewal option unless expressly granted by Landlord in writing;

      (c)      Landlord shall lease to Tenant the Premises in their then-current condition, and Landlord shall not provide to Tenant any allowances (e.g., moving allowance, construction allowance, and the like) or other tenant inducements; all of which shall be considered in establishing the Prevailing Rental Rate; and

      (d)      As part of the determination of Prevailing Rental Rate, Tenant shall pay for the parking spaces which it is entitled to use at the rates from time to time charged to patrons of the Parking Area and/or any other parking area associated with the Building during the extended Term (plus all applicable taxes); provided if Landlord provides abated parking rent for renewals of space in the Building, and such abatement has been taken into account in determining the Prevailing Rental Rate, then Landlord shall provide such abatement to Tenant.

3.      If Tenant rejects Landlord's determination of the Prevailing Rental Rate, and timely notifies Landlord thereof, Tenant may, in its notice to Landlord, either (i) cancel and revoke Tenant's election to renew the Lease, or (ii) require that the determination of the Prevailing Rental Rate be made by brokers (and if Tenant makes the election of items (ii) above, Tenant shall be deemed to have irrevocably renewed the Term, subject only to the determination of the Prevailing Rental Rate as provided below). In such event, within ten (10) days thereafter, each party shall select a qualified commercial real estate broker with at least ten (10) years experience in leasing property and buildings in the city or submarket in which the Premises are located. The two (2) brokers shall give their opinion of prevailing rental rates within twenty (20) days after their retention. In the event the opinions of the two

H-1

(2) brokers differ and, after good faith efforts over the succeeding twenty (20) day period, they cannot mutually agree, the brokers shall immediately and jointly appoint a third (3rd) broker with the qualifications specified above. This third broker shall immediately (within five (5) days) choose either the determination of Landlord's broker or Tenant's broker. The choice of this third (3rd) broker shall be final and binding on Landlord and Tenant, and the parties shall immediately execute an amendment as set forth above. Following the determination of the Prevailing Rental Rate by the brokers, the parties shall equally share the costs of any third (3rd) broker. If Tenant fails to timely notify Landlord in writing that Tenant accepts or rejects Landlord's determination of the Prevailing Rental Rate, time being of the essence with respect thereto, Tenant's rights under this Exhibit shall terminate and Tenant shall have no right to renew this Lease.

4.      Tenant's rights under this Exhibit shall terminate, at Landlord's option, if (i) an Event of Default exists as of the date of Tenant's exercise of its rights under this Exhibit, (ii) this Lease or Tenant's right to possession of any of the Premises is terminated, (iii) Tenant assigns its interest in this Lease (iv) Tenant sublets more than 75,000 rentable square feet of the Premises either in one instance or in the aggregate, other than to a Permitted Transferee, (v) Tenant ceases to lease from Landlord at least 125,000 rentable square feet of space, (vi) Tenant fails to timely exercise its option under this Exhibit, time being of the essence with respect to Tenant's exercise thereof.

H-2

MONTGOMERY CORPORATE CENTER<br>200 DRYDEN ROAD<br>DRESHER, PENNSYLVANIA

**EXHIBIT I**

**RIGHT OF FIRST REFUSAL**

(a)　　"Offered Space" shall mean collectively (i) that certain 20,000 square feet of rentable area and located on the Second Floor of the Building as more specifically depicted on the floor plan attached hereto as Exhibit I-1, (ii) that certain 8,000 square feet of rentable area and located on the First Floor of the Building as more specifically depicted on the floor plan attached hereto as Exhibit I-1, and (iii) that certain 8,000 square feet of rentable area and located on the First Floor of the Building as more specifically depicted on the floor plan attached hereto as Exhibit I-1.

(b)　　Provided that as of the date of the giving of the Offer Notice, (x) Tenant is the Tenant originally named herein, (y) Tenant actually occupies at least 100,000 square feet of rentable area in the Building, and (z) no event of default or event which but for the passage of time or the giving of notice, or both, would constitute an event of default has occurred and is continuing, if at any time during the Term any portion of the Offered Space is vacant and unencumbered by any rights of any third party, and if Landlord intends to enter into a lease (the "Proposed Lease") for all or a portion of the Offered Space with anyone (a "Proposed Tenant") other than the tenant then occupying such space (or its affiliates, subtenants or assignees), then Landlord shall first offer to Tenant the right to lease such Offered Space upon all the terms and conditions of the Proposed Lease for the Offered Space. Notwithstanding anything to the contrary in the Lease, the right of first refusal granted to Tenant under this Exhibit I shall be subject and subordinate to (i) the rights of all tenants at the Building under leases existing as of the Lease Date as set forth on Schedule 1 to this Exhibit I, and (ii) the herein reserved right of Landlord to renew or extend the term of any lease with the tenant then occupying such space (or any of its affiliates, subtenants or assignees), whether pursuant to a renewal or extension option in such lease or otherwise.

(c)　　Such offer shall be made by Landlord to Tenant in a written notice (hereinafter called the "Offer Notice") which offer shall designate the space being offered and shall specify the terms for such Offered Space which shall be the same as those set forth in the Proposed Lease. Tenant may accept the offer set forth in the Offer Notice only by delivering to Landlord an unconditional acceptance (hereinafter called "Tenant's Notice") of such offer within ten (10) business days after delivery by Landlord of the Offer Notice to Tenant. Time shall be of the essence with respect to the giving of Tenant's Notice. If Tenant does not accept (or fails to timely accept) an offer made by Landlord pursuant to the provisions of this Exhibit I with respect to the Offered Space designated in the Offer Notice, or if Tenant timely accepts such offer and fails to execute the Amendment (defined below) within thirty (30) days after the delivery of the Offer Notice, then, subject to Paragraph (e) below, Landlord shall be free to enter into a Lease for the Offered Space on the terms set forth in the Offer Notice. In order to send the Offer Notice, Landlord does not need to have negotiated a complete lease with the Proposed Tenant but may merely have agreed upon the material economic terms for the Proposed Lease, and Tenant must make its decision with respect to the Offered Space as long as it has received a description of such material economic terms.

(d)　　Tenant must accept all Offered Space offered by Landlord at any one time if it desires to accept any of such Offered Space and may not exercise its right with respect to only part of such space. In addition, if Landlord desires to lease more than just the Offered Space to one tenant, Landlord may offer to Tenant pursuant to the terms hereof all such space which Landlord desires to lease, and Tenant must exercise, if at all, its rights hereunder with respect to all such space and may not insist on receiving an offer for just the Offered Space.

(e)　　If Tenant at any time declines any Offered Space offered by Landlord, Tenant shall be deemed to have irrevocably waived all its rights for that specific Offered Space at that time under this Exhibit I, and Landlord shall be free to lease the Offered Space to the Proposed Tenant including on terms which may be less favorable to Landlord than those set forth in the Proposed Lease; provided, however, in the event that either (i) the terms of the Proposed Lease become materially less favorable to Landlord than those set forth in the Offer Notice (it being understood and agreed that "materially less favorable" shall mean that the net present value of the material economic terms of the modified transaction is at least ten percent (10%) less than the net present value of the material economic terms set forth in the Offer Notice), (ii) Landlord has not entered into a lease for all or any portion of such Offered Space with a third party within one hundred eighty (180) days following the delivery by Landlord to Tenant of the Offer Notice, or (iii) the Offered Space once again becomes vacant, then Landlord agrees that Tenant's rights

I-1

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

under this <u>Exhibit I</u> with respect to such Offered Space shall be reinstated and Landlord shall provide Tenant with an Offer Notice if, as, and to the extent, required under the terms of this <u>Exhibit I</u>.

      (f)      In the event that Tenant exercises its rights to any Offered Space pursuant to this <u>Exhibit I</u>, then Landlord shall prepare, and Tenant and Landlord shall execute, an amendment to the Lease which confirms such expansion of the Premises and the other provisions applicable thereto (the "<u>Amendment</u>") as herein provided.

I-2

MONTGOMERY CORPORATE CENTER<br>200 DRYDEN ROAD<br>DRESHER, PENNSYLVANIA

**EXHIBIT I-1**

**OFFERED SPACE**



MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47



PHASE II
GIVE BACK SPACE

I-2

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA



PHASE III
GIVE BACK SPACE

I-3

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

## EXHIBIT J

## LEASE GUARANTY

THIS LEASE GUARANTY, dated _____, 2012, by AJCF CORP., a Delaware corporation, as successor by merger to CGI JCF, Inc., which was formerly known as CRUMP GROUP, INC., a Delaware corporation, having an address at 105 Eisenhower Parkway, Roseland, NJ 07068 (the "Guarantor") in favor of MONTGOMERY CORPORATE CENTER, INC., a California corporation, having an address of CBRE Global Investors, 515 South Flower Street, 31st Floor, Los Angeles, CA 90071, Attention: Michael J. Everly (the "Landlord").

## RECITALS:

A.     As of the date hereof Landlord and Ascensus, Inc., a Delaware corporation ("Tenant") are entering into that certain Lease Agreement of even date herewith (hereinafter referred to as the "Lease") for leasing of a portion of the real property consisting of approximately 168,921 rentable square feet of space within "Building II" in the Montgomery Corporate Center and located in the Township of Horsham, County of Montgomery and State of Pennsylvania (the "Premises").

B.     Landlord and Tenant are contemporaneously with the execution of this Guaranty entering into that certain Lease Agreement of even date herewith pursuant to which Tenant shall lease from Landlord the Premises.

C.     Landlord has agreed to execute that certain Lease Agreement dated substantially concurrently herewith, on the condition that the Guarantor is reaffirming its guaranty of the Lease in the manner hereinafter set forth.

NOW, THEREFORE, to induce the Landlord to enter into the Lease, Guarantor hereby agrees as follows:

1.     The Guarantor unconditionally guarantees to the Landlord the full and punctual performance and observance, by the Tenant, of all the terms, covenants and conditions in, the Lease contained on Tenant's part to be kept, performed or observed. This Guaranty shall include any liability of Tenant that shall accrue under the Lease for any period preceding as well as any period following the term in the Lease.  Guarantor agrees that this Guaranty shall not impair or affect any other existing guaranty that may be in effect relating to the Lease.

2.     If, at any time, default shall be made by the Tenant in the performance or observance of any of the terms, covenants or conditions in the Lease contained on the Tenant's part to be kept, performed or observed, the Guarantor will keep, perform and observe the same, as the case may be, in place and stead of the Tenant.

3.     The Guarantor hereby waives: (a) notice of acceptance of this Guaranty; (b) presentment and demand for any payments due Landlord; (c) protest and notice of dishonor or default to the Guarantor or to any other person or party with respect to the terms of the Lease or any portion thereof; (d) all notices to which the Guarantor might otherwise by entitled under this Guaranty; (e) notice of Tenant's nonpayment, nonperformance or nonobservance; and (f) any demand for payment under this Guaranty.

J-1

MONTGOMERY CORPORATE CENTER<br>200 DRYDEN ROAD<br>DRESHER, PENNSYLVANIA

4.      This is a guaranty of performance and payment and not of collection and the Guarantor waives any right to require that any action be brought against the Tenant or to require that resort be had to any credit on the books of the Landlord in favor of the Guarantor or any other person or party.

5.      Any act of the Landlord, or the successors or assigns of the Landlord, consisting of a waiver of any of the terms or conditions of the Lease or the giving of any consent to any manner or thing relating to the Lease, or the granting of any indulgences or extensions of time to the Tenant, may be done without notice to the Guarantor and without releasing the obligations of the Guarantor hereunder.

6.      The liability of Guarantor under this Guaranty shall be primary and not secondary and Landlord may, at its option, proceed directly against Guarantor or any security granted to Landlord without having to commence any action, or having obtained any judgment against Tenant.

7.      The obligations of the Guarantor hereunder shall not be released by Landlord's receipt, application or release of security given for the performance and observance of covenants and conditions in the Lease contained on Tenant's part to be performed or observed; nor by any modification or amendment of the Lease and in case of any such modification the liability of the Guarantor shall be deemed to have been automatically modified in accordance with the terms of any such modification or amendment of the Lease. Landlord may without notice assign this Guaranty in whole or in part. Upon any transfer or sale of the Premises or underlying real property, or the assignment of said Lease by any means, this Guaranty shall pass to and may be enforced by any such transferee and/or assignee.

8.      The liability of the Guarantor hereunder shall in no way be affected by (a) the release or discharge of the Tenant in any creditors, receivership, bankruptcy or other proceedings, (b) the impairment, limitation or modification of the liability of the Tenant or the estate of the Tenant in bankruptcy, or of any remedy for the enforcement of the Tenant's said liability under the Lease resulting from the operation of any present or future provision of the Bankruptcy Code or other statute or from the decision in any court; (c) the rejection or disaffirmance of the Lease in any such proceedings; (d) the assignment or transfer of the Lease by the Tenant; (e) any disability or other defense of the Tenant, or (f) the cessation from any cause whatsoever of the liability of the Tenant.

9.      Until all the covenants and conditions in the Lease on the Tenant's part to be performed and observed are fully performed and observed, the Guarantor: (a) shall have no right of subrogation against the Tenant by reason of any payments or acts of performance by the Guarantor, in compliance with the obligations of the Guarantor hereunder; (b) waives any right to enforce any remedy which the Guarantor now or hereafter shall have against the Tenant by reason of any one or more payment or acts of performance in compliance with the obligations of the Guarantor hereunder; and (c) subordinates any liability or indebtedness of the Tenant now or hereafter held by the Guarantor to the obligations of the Tenant to the Landlord under the Lease.

10.     This Guaranty shall apply automatically to the Lease any extension or renewal thereof and to any holdover term following the term thereby granted.

11.     Each reference herein to the Landlord shall be deemed to include its successors and assigns, in whose favor the provisions of this Guaranty shall also inure and who shall be bound by the provisions of this Guaranty. Each reference herein to the Guarantor shall be deemed to automatically include the successors, heirs and assigns of the Guarantor, in whose favor the provisions of this Guaranty shall also inure and all of whom shall be bound by the provisions of this Guaranty.

J-2

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

12.     No delay on the part of the Landlord in exercising any rights hereunder or failure to exercise the same shall operate as a waiver of such rights; no notice to or demand on the Guarantor shall be deemed to be a waiver of the obligation of the Guarantor or of the right of the Landlord to take further action without notice or demand as provided herein; nor in any event shall any modification or waiver of the provisions of this Guaranty be effective unless in writing nor shall any such waiver be applicable except in the specific instance for which given.

13.     Any notice or demand given or made under this Guaranty shall be given or made by mailing the same by certified mail to the party to whom the notice or demand is given or made at the address of such party set forth in this Guaranty or at such other address as may appear in Landlord's records.

14.     In the event of a default under any of the terms of the Lease, Landlord shall have the right to proceed directly and immediately against the Guarantor and such proceeding is not to be deemed an irrevocable election of remedies. All rights and remedies of Landlord hereunder and under the Lease are cumulative and may be pursued simultaneously or in whichever order Landlord shall determine.

15.     This Guaranty is, and shall be deemed to be, a contract entered into under and pursuant to the laws of the Commonwealth of Pennsylvania and shall be in all respects governed, construed, applied and enforced in accordance with the laws of said State; and no defense given or allowed by the laws of any other state or country shall be interposed in any action or proceeding hereon unless such defense is also given or allowed by the laws of the Commonwealth of Pennsylvania. The Guarantor agrees to submit to personal jurisdiction of the Courts of Common Pleas of Pennsylvania and/or the United States District Court for the Eastern District of Pennsylvania in any action or proceeding arising out of this Guaranty and, in furtherance of such agreement, the Guarantor hereby agrees and consents that, without limiting other methods of obtaining jurisdiction, jurisdiction over the Guarantor in any such action or proceeding may be obtained within or without the jurisdiction of any court located in Pennsylvania.

16.     This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by the Guarantor and the Landlord.

17.     Within ten (10) days after request therefor by Landlord, or in the event that upon any sale, assignment, or hypothecation of the Premises or the land thereunder by Landlord or the Building or Property, an estoppel certificate and/or financial statement shall be requested of Guarantor, and Guarantor agrees to deliver such financial statement, and to deliver such estoppel certificate addressed to any such proposed mortgagee or purchaser or to the Landlord certifying any reasonably requested information, including among other things the dates of commencement and termination of said Lease, the amounts of security deposits, and that said Lease and this Guaranty are in full force and effect (if such be the case) and that there are no defaults, offsets or defaults of Landlord, or noting such defaults, offsets or defaults as actually exist.

18.     **THE GUARANTOR AND THE LANDLORD AGREE THAT ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY THE LANDLORD OR THE GUARANTOR ON OR WITH RESPECT TO THIS GUARANTY OR THE LEASE SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. THE LANDLORD AND THE GUARANTOR EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, THE GUARANTOR WAIVES ANY RIGHT THE GUARANTOR MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER**

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. THE GUARANTOR ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS GUARANTY.

_____                      _____

Landlord Initials                                Guarantor Initials

**[SIGNATURE ON FOLLOWING PAGE]**

J-4

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

IN WITNESS WHEREOF, the Guarantor has executed and delivered this Guaranty on the _____ day of _____, 2013.

AJCF CORP., a Delaware corporation


By:_____
Name:_____
Title:_____

MONTGOMERY CORPORATE CENTER
200 DRYDEN ROAD
DRESHER, PENNSYLVANIA

703779067.9 30-Jan-13 10:47